# Exhibit A

EXECUTION

# LEASE AGREEMENT

between

**B.S. INGERSOLL, LLC**

Landlord

and

**MEDICI 1150 N. AMERICAN STREET LLC**

Tenant

EXECUTION

# TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | Basic Lease Provisions. | 4 |
| 2. | Landlord's Lease of Premises; Term. | 7 |
| 3. | Landlord's Representations and Warranties; Acceptance of Premises | 7 |
| 4. | Rent. | 12 |
| 5. | Real Estate Taxes. | 12 |
| 6. | Intentionally Omitted. | 13 |
| 7. | Access; Supplemental Security Measures; Utilities and Services. | 13 |
| 8. | Common Areas. | 16 |
| 9. | Security Deposit. | 16 |
| 10. | Use and Maintenance of the Premises. | 18 |
| 11. | Alterations by Tenant. | 22 |
| 12. | Tenant's Personal Property. | 24 |
| 13. | Signage. | 24 |
| 14. | Assignment and Subletting | 25 |
| 15. | Insurance. | 27 |
| 16. | Indemnity. | 29 |
| 17. | Landlord Default. | 30 |
| 18. | Damage or Destruction. | 31 |
| 19. | Condemnation. | 32 |
| 20. | Default by Tenant; Landlord's Remedies. | 32 |
| 21. | Subordination. | 34 |
| 22. | Estoppel Certificates. | 36 |
| 23. | End of Term; Hold-Over. | 36 |
| 24. | Quiet Enjoyment. | 37 |
| 25. | Notices. | 37 |
| 26. | Miscellaneous. | 38 |

27.    Options to Extend Term...................................................................................... 41

28.    Marketing; Confidentiality.............................................................................. 42

29.    FF&E Allowance. ............................................................................................. 43

30.    Tenant's Financing........................................................................................... 44

31.    Arbitration........................................................................................................ 46

Exhibit A-1    Floor Plan of Premises
Exhibit A-2    Floor Plan of Exclusive Common Areas
Exhibit B      Landlord's Work
Exhibit C      Certificate of Commencement
Exhibit D      Signage Specifications
Exhibit E-1    Base Rent
Exhibit E-2    Extension Period Base Rent
Exhibit F      Form of Guaranty
Exhibit G      Form of Memorandum of Lease
Exhibit H      Environmental Reports
Exhibit I      Proposed Fitness Center
Exhibit J      Form of Letter of Credit

LEASE AGREEMENT

This Lease Agreement (this "**Lease**") is made this 12th day of November, 2018 ("**Effective Date**") by and between (i) **B.S. INGERSOLL, LLC**, a Pennsylvania limited liability company ("**Landlord**"), and (ii) **MEDICI 1150 N. AMERICAN STREET LLC**, a Delaware limited liability company ("**Tenant**").   Landlord and Tenant are each sometimes referred to as a "**Party**" and together are referred to as the "**Parties**."

Landlord and Tenant hereby covenant and agree as follows.

1.     *Basic Lease Provisions.*

    **1.1**    **Premises:**  No less than 59,000 rentable square feet of space, consisting of approximately seventy-six (76) residential units (each, a "**Unit**"), each containing no less than two (2) legal bedrooms for a total of no less than one hundred eighty-six (186) legal windowed bedrooms, located on the second (2nd) through sixth (6th) floors of the Building, together with no less 1,391 square feet of interior, and no less 2,833 square feet of exterior, amenity space located on the sixth (6th) floor of the Building, all as set forth in Exhibit A-1 hereto, as well as the exclusive right to use the Common Areas in the Building consisting of (a) an exclusive entrance, lobby and mailroom on the first (1st) floor of the Building, (b) bicycle storage in an exterior shed, (c) a portion of each of the second (2nd) through sixth (6th) floors of the Building for a trash room and (d) a portion of the basement of the Building for bike storage, all as set forth on Exhibit A-2 hereto (collectively, the "**Exclusive Common Areas**"), provided that the Premises shall not include any Structural Elements.

    **1.2**    **Building:**  The building to be constructed having an address of 1150-1156 North American Street, Philadelphia, Pennsylvania 19104, Parcel ID: 884036052, and all alterations, additions, improvements, restorations and replacements to be made thereto.

    **1.3**    **Term:**  The time period that begins on the Commencement Date and ends on the Expiration Date, unless sooner terminated pursuant to the terms of this Lease or otherwise.

    **1.4**    **Commencement Date:**  The date which is the Delivery Date.

    **1.5**    **Expiration Date:**  The last day of the tenth (10th) Lease Year, subject to Section 27.

    **1.6**    **Rent Commencement Date:**   The date which is three (3) months following the Commencement Date, provided that the Rent Commencement Date shall be extended as follows: (i) the Rent Commencement Date shall be extended one day for each day by which Tenant's Pre-Commencement Period (as defined below) is less than forty-five (45) days and (ii) in the event that the Delivery Date has not occurred on or before the Outside Delivery Date, the Rent Commencement Date shall be extended one day for each day after the Outside Delivery Date until the Delivery Date shall have occurred.

1.7     **Lease Year:**  The first "Lease Year" shall commence on the Commencement Date, and end either (i) if the Rent Commencement Date is the first day of a month, twelve (12) full calendar months after the Rent Commencement Date, or (ii), if the Rent Commencement Date is a day other than the first day of a month, the last day of the twelfth (12th) full calendar month after the Rent Commencement Date.  Each subsequent Lease Year shall commence on the date immediately following the last day of the preceding Lease Year and shall continue for a period of twelve (12) full calendar months, except that the last Lease Year of the Term shall terminate on the date this Lease expires or is otherwise terminated.

1.8     **Base Rent:**  The Base Rent for each Lease Year during the initial Term, annually and monthly, is set forth on Exhibit E-1 attached hereto.

1.9     **Additional Rent:**  All amounts expressly required to be paid by Tenant to Landlord under this Lease, except for Base Rent.

1.10    **Rent:**  Base Rent and Additional Rent.

1.11    **Broker:**  Savills Studley, Inc. and Vicus Partners, LLC.

1.12    **Land:**  The land upon which the Building is located, including all rights, easements and appurtenances belonging or pertaining thereto.

1.13    **Project:**  The Land and all improvements thereon, including the Building and the Common Areas.

1.14    **Permitted Uses:**  All uses as permitted by applicable Laws and the unconditional temporary or permanent certificate(s) of occupancy Landlord shall obtain for the Building (the **"Certificate of Occupancy"**), including residential use and all uses incidentally or customarily related thereto, including, without limitation, (i) operation and management of the Premises for the operation of a residential co-living facility with associated amenity space, including, without limitation, as a lounge, media room, technology area, laundry area on each floor, cooking and meal preparation areas and/or resident fitness room and outdoor space, (ii) marketing to and contracting with Customers for ancillary services to such Customers including, without limitation, dry cleaning, food delivery, cleaning services, car sharing, bike sharing, dog walking and concierge services, and (iii) the negotiation of subleases, licenses and occupancy agreements, and such other forms of leasehold interests or other occupancy rights with Customers.  For the avoidance of doubt, (1) pets and bicycles shall be permitted inside and around the Premises and the Building and (2) there shall be no profit sharing with Landlord in connection with Tenant's use of the Premises for the Permitted Uses and Tenant shall retain all net proceeds in connection with such use.  Tenant shall be permitted to use on an exclusive basis the Exclusive Common Areas within the cellar floor as set forth on Exhibit A-2 hereto as bike storage.  Landlord shall cooperate with Tenant, at Tenant's sole cost and expense, as is reasonably necessary in connection with Tenant obtaining all licenses and permits required to be issued by any Governmental Authority for the conduct of the Permitted Uses. Notwithstanding the foregoing, it shall be Landlord's responsibility hereunder to maintain a valid Certificate of Occupancy for the Building that permits the Permitted Uses.  In the event that Tenant or its

licensees, subtenants or Customers are ordered by any Governmental Authority to vacate the Premises, or Tenant is prohibited by Law from collecting rent from its licensees, subtenants or Customers, solely by reason of Landlord's failure to maintain a valid Certificate of Occupancy for the Building that permits the Permitted Uses, the Base Rent and Additional Rent due and payable hereunder shall abate commencing on the effective date of such order or such prohibition until the date that Tenant is once again legally permitted to collect such rent or resume such use and occupy the Premises for the Permitted Uses, as applicable.  In no way limiting the foregoing, Landlord shall indemnify, defend, protect and hold Tenant harmless from and against any and all actual losses, liabilities, damages, claims, fines and expenses of any kind or nature, including reasonable attorneys' fees and disbursements, which the Tenant may incur by reason of (i) any fines assessed by any Governmental Authority in connection with Landlord's failure to maintain such valid Certificate of Occupancy for the Building and (ii) the cessation of Tenant's business in the Premises for the Permitted Uses (such as fees payable to move Customers or personal property).   In no event shall Landlord's consent be required for any Permitted Use.

     **1.15   Structural Elements**:  The roof and every part thereof (including the roof membrane, but excluding the surface of any rooftop deck., i.e., pavers, tiles or planks), foundation, floor slabs, structure, framing, exterior walls, façade and curtainwall of the Building, fire escapes, balconies, footings, load bearing walls and columns, window sashes, including glass and glazing, stairs and corridors, shafts, core electrical closets, core telecommunications closets, core janitor closets and mechanical rooms (whether or not the same are included in the Premises), service and utility areas, patios, walkways, railings, gates, fences, storefronts, all curbs and sidewalks adjacent to the Building, exterior doors and windows, exterior glass, garage, parking areas, loading areas, docks and related elements and the Building Systems.

     **1.16   Building Systems**:  The mechanical and electrical systems and any heat, ventilation and air conditioning system (including boilers, cooling towers, condensors, pumps and associated equipment) (to the extent such heat, ventilation and air conditioning system is not located within and exclusively serving the Premises), generators, elevators, trash compactors, lighting, pipes and plumbing, plumbing stacks and water distribution piping, storm and sanitary sewer, communication, security, fire protection, fire pumps, sprinkler and life safety systems of the Building (including fire alarm devices and warden stations), including risers contained in the walls of the Building (but shall not include the portions of such systems, or the distribution facilities appurtenant thereto, located within and exclusively serving the Premises), to the point of connection in each floor of the Premises.

     **1.17   Tenant Systems**:  The HVAC air handler units located within each Unit of the Premises, the plumbing, sanitary, electrical and lighting fixtures located within the Premises, and the communication and security systems located within the Premises, except to the extent any of the foregoing constitute Building Systems or Structural Elements.

     **1.18   Comparable Buildings**:  Comparable market-rate mid-rise, doorman, mixed-use, multifamily elevator residential buildings located in the area immediately surrounding the Building in Philadelphia, Pennsylvania of similar use, age, size, quality and location as the Building, that are not encumbered by a "master lease" or similar arrangement.

    **1.19**    **Guarantor.**  Medici Living Holding Gmbh, a German company with limited liability.

    **1.20**    **Guaranty.** The Guaranty executed by the Guarantor for the benefit of Landlord in the form of <u>Exhibit F</u> attached hereto.

    *2.*    **Landlord's Lease of Premises; Term.**

    **2.1**    Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord the Premises for the Term.

    **2.2**    This Lease shall be in full force and effect from the date hereof.  The Term of this Lease shall commence on the Commencement Date and shall end on the Expiration Date unless otherwise extended or terminated in accordance with the terms hereof.

    **2.3**    Notwithstanding anything to the contrary contained herein, (a) in the event that Landlord has not commenced construction of the Building (with commencement of construction including excavation of the Land for the foundation system for the Project) by March 1, 2019, or (b) in the event that the Delivery Date has not occurred within thirty (30) days following the Anticipated Delivery Date (as hereinafter defined) (the "**Outside Delivery Date**"), then Tenant may, at any time before commencement of construction or the Delivery Date, as applicable, occurs, give Landlord a written notice of termination of this Lease, in which event Landlord shall reimburse Tenant for any advance rent and deposits paid by Tenant, including, to the extent delivered to Landlord, the Security Deposit, together with any and all costs incurred by Tenant in connection with this Lease, including, without limitation, expenses of Tenant for legal fees, architectural fees and the cost of Tenant's Personal Property purchased for the Premises, as documented to Landlord showing reasonable detail and back-up, and upon such payment and return, both parties shall be relieved of all obligations under this Lease.

    *3.*    *Landlord's Representations and Warranties; Acceptance of Premises.*

    **3.1**

        (a)    The "**Delivery Date**" shall occur upon satisfaction of the following conditions in Tenant's reasonable discretion:  (i) Landlord has delivered exclusive possession of the Premises and the Exclusive Common Areas to Tenant, vacant, broom-clean, in good condition and repair, with all Building Systems and Tenant Systems, appliances and equipment therein in good working order, and ready for occupancy with the Landlord's Work (as defined in <u>Exhibit B</u> attached hereto) Substantially Complete (as defined in and in accordance with <u>Attachment 1</u> of <u>Exhibit B</u> attached hereto), in accordance with all applicable Laws, and free of violations of record which prohibit multi-tenant use of the Premises, with the exception of Punch List Items (as defined below), and (ii) Landlord has obtained and provided to Tenant, the Certificate of Occupancy for the Building, which shall permit the Permitted Uses in the Premises, and which shall then be in full force and effect.   Within ten (10) days following the Delivery Date, Landlord and Tenant shall enter into a Certificate of Commencement in substantially the form attached hereto as <u>Exhibit C</u>.  The Delivery Date is anticipated to occur on

or before September 1, 2019 (the "**Anticipated Delivery Date**").  Landlord shall give Tenant a notice, specifying the date upon which Landlord anticipates that the Delivery Date shall occur, which notice will be delivered no later than thirty (30) calendar days prior to the actual Delivery Date. Such notice shall be accompanied by a certificate of completion by Landlord's architect for the Building, which certificate shall include a list of minor items of work and minor adjustments of equipment and fixtures to be completed or corrected by Landlord, of an insubstantial nature, the noncompletion of which will not prohibit or interfere with the use of the Premises for the Permitted Uses, nor materially detract from the appearance and utility of the Premises for the Permitted Uses, and that can be completed without causing unreasonable interference with Tenant's use of the Premises, including the occupancy of Units in the Premises by Customers (the "**Punch List Items**").  Promptly following delivery of such notice of the anticipated Delivery Date, duly authorized representatives of Landlord and Tenant, along with the architect for Landlord's Work, shall jointly inspect Landlord's Work with respect to the Premises and the Common Areas and the Punch List Items shall be subject to review and approval by Tenant following such joint inspection. Landlord shall complete the Punch List Items at its sole cost and expense and in a good workmanlike manner on or before the date that is ninety (90) days (or up to one hundred twenty (120) days for Punch List Items that cannot be completed within ninety (90) days due to seasonal delays or for Punch List Items which require materials subject to long lead order times) after the Delivery Date, provided, however, that Landlord shall complete, with due diligence, at its sole cost and expense and in a good workmanlike manner, on or before the date that is thirty (30) days after the Delivery Date any Punch List Items and any other defects in Landlord's Work that adversely affect the habitability of the Premises, including, without limitation, leaking or non-functioning plumbing, non-functioning HVAC, non-functioning or missing kitchen or bathroom fixtures or appliances, non-functioning or missing lighting fixtures, leaking, broken or non-functioning windows, and non-functioning interior or entrance doors or door locks.  Landlord shall have the right to enter the Premises at reasonable times and upon reasonable prior notice to Tenant to complete the Punch List Items; provided, however, that Landlord shall use reasonable efforts to minimize any disruption of Tenant's business.  If after Tenant provides notice to Landlord that Landlord has failed to timely complete any of the Punch List Items as described in this Section 3.1(a), Landlord fails to remedy the same within five (5) Business Days following such notice, then and in such event Tenant may take action to complete such Punch List Items and may recover the reasonable third party costs it incurred in the completion of such Punch List Items by Tenant on behalf of Landlord.  All sums so paid by Tenant, and all reasonable costs and expenses of Tenant incidental thereto, shall be payable to Tenant on demand, and Landlord covenants to pay any such sum or sums with interest at the Applicable Rate (as defined below), and in the event such amounts are not paid within ten (10) days following demand therefor, Tenant shall have the right to offset the same against the Base Rent next due and owing.  Tenant's exercise of the foregoing rights under this Section 3.1(a) shall not be deemed to cure or waive any Landlord default to complete the Punch List Items. Landlord shall deliver to Tenant proof of the issuance of any required approvals, permits and signoffs required by all Governmental Authorities for the "final completion" of Landlord's Work hereunder.

(b)     Promptly after the Delivery Date, Landlord's and Tenant's architects shall confirm the rentable square feet of the Premises and of the Exclusive Common Areas, calculated

in accordance with the standards of ANSI/BOMA Z65.4-2010, and in the event that such calculations provide that the rentable square feet of the Premises and of the Exclusive Common Areas are less than the square footage set forth in Section 1.1 and Exhibits A-1 and A-2, then Base Rent shall be reduced pro rata to reflect such decreases, provided that in no event shall the Base Rent or Additional Rent increase under this Lease.

(c)     Any dispute between Landlord and Tenant as to the obligations imposed or rights conferred upon either party by any provision of this Section 3.1 or as to the performance or failure of performance of any such obligations (including any monetary disputes or disputes relating to the determination of the Commencement Date or the Rent Commencement Date or the rentable square feet of the Premises and of the Exclusive Common Areas), shall be resolved using the process for dispute resolution set forth in Section 31 of this Lease.

3.2     Landlord represents and warrants to Tenant as of the Effective Date and again on the Commencement Date that:

(a)     Landlord owns fee simple title to the Premises and has the unconditional right to enter into this Lease and perform its obligations under this Lease during the Term. The lease of the Premises also is subject to and benefits from any covenants, conditions and restrictions of record.   A copy of Landlord's current title policy has been delivered to Tenant prior to the date hereof.  Landlord hereby agrees that it will not record against the Building after the Effective Date and during the Term any covenant, condition or restriction that adversely affects Tenant's use of the Premises for the Permitted Uses and in accordance with the terms of this Lease, other than to a de minimis extent.

(b)     Excepting any mortgage currently encumbering the Building (provisions for which are addressed in Section 22 hereof) as of the Commencement Date, the Premises shall be free from liens and encumbrances except for matters that do not prohibit or restrict Tenant's proposed use of the Premises for the Permitted Uses.

(c)     As of the Commencement Date, (i) the Premises as constructed shall be structurally sound, well-built and fit for Tenant's intended use, (ii) the Premises shall be constructed in accordance with applicable Law and the Current Construction Documents, as same may be amended from time to time, and (iii) the Premises, the Common Areas and the Structural Elements of the Building shall be in good condition and repair and all Building Systems, and the distribution facilities appurtenant thereto located within and serving the Premises, Tenant Systems, appliances and equipment, lavatories and other fixtures located in or serving the Premises shall be in good condition and working order.   Landlord shall warrant to Tenant for the first five (5) Lease Years all repairs and replacements (including materials and labor) for all mechanical, electrical and plumbing systems located in or serving the Premises and for all interior build-out portions of Landlord's Work (other than any repairs and replacements required due to Tenant's or its employees', agents', contractors' and representatives' gross negligence or directly related to the failure to perform routine maintenance).  In addition, in the event warranties are provided directly by Landlord's general contractor, subcontractors and/or tradesmen performing the installation of such mechanical, electrical and plumbing systems or Landlord's Work or any repairs and/or replacement thereto, Tenant shall have the benefit of such

warranties. Landlord shall provide Tenant with copies of all such warranties prior to the Commencement Date, or upon Substantial Completion of such work performed after the Commencement Date, as applicable.  In addition, Landlord shall correct any latent defects in the Premises promptly after notification thereof by Tenant.

        (d)     As of the Commencement Date, the Building shall be in compliance in all material respects with all Laws, including, without limitation, ADA.  As of the Commencement Date, the Building will not be, and shall not be during the Term, subject to any affordable housing, inclusionary zoning, planned unit development or zoning board orders or any other Laws relating to rent control, rent stabilization or any other rent regulation (collectively, "**Rent Regulation Laws**").  Landlord covenants that it shall take no affirmative action during the Term to initiate the Building becoming subject to any Rent Regulation Laws, including, without limitation, applying for any real estate tax abatements, to the extent same may cause the Building, or any portion thereof, to become subject to any Rent Regulation Laws.  In clarification of the foregoing and not in limitation thereof, Landlord represents and warrants to Tenant that any real estate tax abatements for which Landlord may apply with respect to the Project or any portion thereof shall not cause the Building, or any portion thereof, to become subject to any Rent Regulation Laws.  In the event that Tenant is ordered to cease operating the Building as a fair market, multi-tenant residential building, or is otherwise prohibited from collecting fair market rent, due to Rent Regulation Laws, then Landlord shall use commercially reasonable efforts to cause the Building to be deregulated such that Tenant may resume such operations.   During any period of time that Tenant is subject to such an order or other prohibition, Base Rent and Additional Rent due and payable hereunder shall abate in whole, or in part if such order or other prohibition relates to only a portion of the Units, commencing on the effective date of such order or other prohibition until the date that such order or other prohibition is terminated or removed, as applicable. Landlord agrees to use commercially reasonable efforts to cause the subject order or other prohibition to be terminated or removed, as applicable.  In the event that such order or other prohibition is not terminated or removed, as applicable, within thirty (30) days after Landlord receives written notice thereof from Tenant, then Tenant shall have the right to terminate this Lease immediately upon written notice to Landlord, in which event this Lease shall terminate as of the date set forth in such notice. Furthermore, in the event that the Building, or any Unit therein, is as of the Commencement Date, subject to Rent Regulation Laws, or becomes subject to Rent Regulation Laws due to a breach of the covenant of Landlord set forth in the first sentence of this Section 3.2(d), Landlord shall indemnify, defend, protect and hold Tenant harmless from and against any and all losses, liabilities, damages, claims, judgments, fines, suits, demands, costs, interest and expenses of any kind or nature, including reasonable attorneys' fees and disbursements, which Tenant may incur by reason of any claim of or liability arising therefrom.

        (e)     To Landlord's knowledge, as of the Effective Date, there are no Hazardous Materials in, on or under the Land, except as disclosed on the reports listed on Exhibit H attached hereto and made a part hereof.  As of the Commencement Date the Project shall be in compliance with all Laws relating to Hazardous Materials.  Landlord warrants that Landlord has fully disclosed to Tenant on Exhibit H any and all reports, analyses, studies or other documents, including environmental and air quality studies that would identify Hazardous Materials in the Premises.  At all times during the Term, Landlord shall: (i) comply with and take all action

required by Environmental Laws and maintain and operate the Building in accordance therewith; and (ii) promptly make all disclosures to Tenant and/or Governmental Authorities that may be required by Laws relating to Hazardous Materials.

(f)     The Certificate of Occupancy for the Building shall be in full force and effect and shall permit Tenant to use the Premises for the Permitted Uses. As of the Commencement Date, Tenant shall be permitted to use the Premises for the Permitted Uses under the Philadelphia Zoning Code, including, without limitation, for "Group Living" thereunder.

(g)     To the best knowledge of Landlord, no action, suit, application, order, protest, complaint or proceeding has been commenced against Landlord in connection with the Building or that would adversely affect the use and occupancy of the Premises for the Permitted Uses and there are no pending or contemplated condemnation proceedings.

Landlord shall indemnify, defend, protect and hold Tenant and all Tenant Parties harmless from and against any and all losses, liabilities, damages, claims, judgments, fines, suits, demands, costs, interest and expenses of any kind or nature, including reasonable attorneys' fees and disbursements, which the Tenant may incur by reason of any claim of or liability arising from a breach of the representations and warranties of Landlord set forth in Section 3.2(d), (e) or (f), or any covenant of Landlord set forth in such Section 3.2(d), (e) or (f). "**Tenant Parties**" shall mean Tenant and its parents, subsidiaries, affiliates, members, shareholders, principals, beneficiaries, partners, officers, directors, employees, agents and representatives.

**3.3**     Landlord, at Landlord's sole cost and expense, shall construct the Building in accordance with Exhibit B attached hereto ("**Landlord's Work**"), in order that the completion of Landlord's Work shall provide a "turn-key" build-out of the Premises for Tenant as of the Delivery Date, with the Premises ready for occupancy for the Permitted Uses, and all Common Areas completed. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to enter the Premises for a period of no less than forty-five (45) days prior to the Delivery Date (the "**Tenant's Pre-Commencement Period**") in order to inspect Landlord's performance of Landlord's Work and to install Tenant's Personal Property, including, without limitation, furniture, fixtures and equipment, in the Premises, and for the purpose of taking measurements. Such access shall be without liability for Base Rent or Additional Rent during Tenant's Pre-Commencement Period, but subject to all other terms, covenants, conditions and provisions of this Lease. Landlord represents that true, correct and complete copies of the Current Construction Documents have been delivered to Tenant. Tenant's review and approval of the Current Construction Documents or any other documents relating to Landlord's Work shall create no responsibility or liability on the part of Tenant for their completeness, design, sufficiency, or compliance with any applicable Laws. "**Current Construction Documents**" shall mean the construction level detailed and coordinated drawings and specifications for Landlord's Work prepared by or on behalf of the Landlord's architect, as more fully listed and described on Attachment 1 to Exhibit B of this Lease. The Current Construction Documents may be modified by the mutual agreement of Landlord and Tenant, provided that Tenant shall have the right to make changes, substitutions and eliminations in said Current Construction Documents related to the Premises, provided, however, that, after the Delivery Date, Tenant shall

pay upon written demand any additional out-of-pocket costs and expenses reasonably incurred by Landlord on account of any such changes, substitutions and eliminations. As a condition precedent to Tenant's obligation to remit payment to Landlord for such costs and expenses, Landlord shall furnish Tenant reasonably detailed documentation indicating such additional reasonable costs and expenses.

### 4.   *Rent.*

**4.1**   Tenant shall pay to Landlord, at the address provided in Section 26, which Landlord may change from time to time in writing upon notice to Tenant, by check or electronic transfer of good funds, Base Rent in the amounts set forth in Section 1.8. Notwithstanding the foregoing, Landlord hereby waives payment of Base Rent and Additional Rent for the period from and including the Commencement Date until the Rent Commencement Date.

**4.2**   Base Rent payments shall be due and payable on the first (1st) day of each calendar month. In the event that Tenant fails to pay Base Rent to Landlord on or before the fifth (5th) day of each calendar month, Tenant shall pay a late charge equivalent to two percent (2%) of the outstanding balance of the Base Rent then due and unpaid.

### 5.   *Real Estate Taxes.*

**5.1**   Landlord shall pay, at its sole cost and expense, without reimbursement by Tenant, all (a) real estate taxes and assessments, general and special, ordinary and taxes and assessments levied in substitution or supplementation in whole or in part of such taxes, (b) personal property taxes for the Landlord's personal property in the Building, (c) other taxes, fees and assessments now or hereafter levied by any Governmental Authority on the Project, the Building or its contents or on the operation and use thereof, including without limitation business improvement district charges or taxes, (d) taxes and assessments now or hereafter imposed on the Building and/or Land or any part thereof with respect to any public or quasi-public facilities, structures, improvements, services, roads or transportation, (e) all unincorporated business franchise or gross receipts taxes to the extent imposed on Landlord's gross receipts or gross income (as opposed to Landlord's net income), (f) costs and fees incurred in connection with seeking reductions in or refunds in real estate taxes including, without limitation, any costs incurred by Landlord to challenge the tax valuation of the Building or to sustain a proposed assessment by reason of a challenge thereto from a citizens group or other entity, (g) transfer taxes and recordation taxes, and (h) all income taxes imposed on or measured by the income of Landlord from the operation of the Building, estate taxes, inheritance taxes or any other tax computed based upon the net income (as opposed to gross receipts or gross income) of Landlord, capital gains, unincorporated business, franchise, capital stock, excise, corporate, succession, estate, inheritance, gift, levy or income, profit or revenue tax, transfer taxes and recordation taxes.

6.    *Intentionally Omitted.*

7.    *Access; Supplemental Security Measures; Utilities and Services.*

   **7.1**   Tenant shall have access to the Premises on a full-time twenty-four (24) hour basis, seven (7) days per week, fifty-two (52) weeks per year, through a dedicated lobby for the exclusive use of Tenant, its Customers and any other residents of the Premises.  The Building shall be equipped with a modern entry system, including an intercom system, based on specifications provided by Tenant, which controls access to the perimeter of the Building and provides access to the Building for Tenant, its Customers and any other residents of the Premises.  An initial set of key fobs and/or codes for access to each Unit shall be provided by Landlord, provided that all replacements shall be at the sole cost of the Tenant.

   **7.2**   Landlord, at Landlord's cost and expense, shall provide and install the Building's security and fire alarm systems and remain responsible for annual testing and certification of such systems.  Such installation shall include, at Landlord's cost and expense, the installation of the security and fire alarm systems within the Premises, including wiring, sensors, keypads and cameras, according to specifications to be reasonably agreed upon by Landlord and Tenant after the date of this Lease, which approval shall not be unreasonably withheld, conditioned or delayed.  Landlord, at Landlord's cost and expense, shall also provide and install wiring within the Premises for Tenant's wifi system, according to specifications to be reasonably agreed upon by Landlord and Tenant after the date of this Lease, which approval shall not be unreasonably withheld, conditioned or delayed.  The Building's security system shall have interior and exterior surveillance cameras in the Common Areas of the Building and Tenant shall have access to such cameras for the purpose of monitoring same.  Except as expressly provided in this Section 7.2, Tenant agrees to pay all maintenance, repair and replacement costs and expenses of its security system to the extent contained within the Premises, but not the cost of annual testing or the cost of the initial installation thereof, and subject to the warranty set forth in Section 3.2(c) hereof. Tenant agrees to enter into, at Tenant's cost and expense, a service contract for monitoring the security system and fire alarm system servicing the Premises.

   **7.3**   Landlord will furnish the following services and utilities to the Premises, at Landlord's sole cost and expense and without reimbursement from Tenant (except as otherwise set forth in this Lease including, without limitation, Sections 5 or 7.4), and during the Term Landlord shall provide and maintain all Building Systems necessary to furnish the following services and utilities to the Premises:

           (a)    Exclusive use of two (2) elevators at all times;

           (b)    Cooled and heated air and ventilation sufficient for normal residential use and occupancy consistent with such service provided in a Comparable Building;

           (c)    Hot and cold water sufficient for normal residential use and occupancy of a Comparable Building, including for ordinary drinking, lavatory, showers, bathroom, laundry, kitchen and cleaning purposes;

(d)      Washer and dryer hook-ups (including electricity, water and drainage) in locations set forth on Exhibit A-1 hereto, and installation of washers and dryers provided by Tenant; and

(e)      Electrical service sufficient for the normal residential use and occupancy of a Comparable Building.

7.4      All utility consumption in the Premises, including, without limitation, electricity, water, sewer, telephone, cable television, internet, and other communication services shall be paid by Tenant (or caused to be paid by Tenant) directly to the applicable service providers ("**Unit Utilities**").   Water and sewer charges, as recorded on the direct meter servicing the Premises shall be paid for by Tenant directly to the applicable service provider.   As of the Commencement Date, the Premises shall have direct metered electrical energy provided from the public utilities furnishing electric service to the Building, and Tenant shall arrange to have each such utility service in the name of Tenant with such electricity providers for the furnishing of electricity to the Premises, and the costs of such service, including any deposits or fees, shall be paid by Tenant directly to the applicable utility provider.   Landlord at all times shall cooperate fully with Tenant and allow Tenant, at reasonable times and upon reasonable notice (except in the event of emergency), to access the Common Areas to furnish electricity to the Premises.   All meters required to measure utility consumption in the Premises shall be installed as of the Commencement Date, at Landlord's cost and expense, and shall be in good working condition as of the Commencement Date, and all such meters and submeters shall be maintained and repaired by Landlord, at Landlord's cost and expense, without reimbursement as Expenses.

7.5      If any utility service to the Premises is interrupted for more than twenty-four (24) consecutive hours as a result of the default of Landlord under this Lease or Landlord's actions or negligence, and the Premises or any part thereof is rendered uninhabitable, then Base Rent and all Additional Rent and other charges shall abate (with respect to the Premises, Rent shall be abated on a per Unit basis, and with respect to the Exclusive Common Areas, Rent shall be abated to reflect the loss of use of the affected Exclusive Common Areas) until the utility service is fully restored and the Units are otherwise rendered habitable.   In all events, to the extent the same is within its reasonable control, Landlord shall exercise commercially reasonable efforts to minimize the effect of such interruption and to remedy such interruption of such service or system.

7.6      If any public utility or Governmental Authority shall require Landlord or Tenant to restrict the consumption of any utility or reduce any service to the Premises or the Building, Landlord and Tenant shall comply with such requirements, whether or not the utilities and services referred to in this Section are thereby reduced or otherwise affected, without any abatement or reduction of the Rent or other sums payable by Tenant hereunder.   "**Governmental Authority**" means any federal, state or local governmental agency, bureau, department or authority having jurisdiction over the Project or the parties.

7.7      Landlord shall promptly provide Tenant with any additional information on any changes to the redundant power in the Building.

**7.8**   Tenant shall be responsible for the selection and installation of appropriate technology providers for the Premises.

**7.9**   **Riser, Conduit and Roof Rights**.   Landlord shall provide sufficient riser and conduit capacity between each floor of the Premises, dedicated solely for Tenant's use in a secured manner, as well as conduit and riser capacity from the roof of the Building to each floor of the Premises and an area on the roof to be used for satellite, internet and/or other communication equipment. The minimum size, location, orientation and configuration of Tenant's roof area shall be determined collaboratively by Landlord and Tenant. Satellite and communication equipment placement by Tenant for use by any third parties will require Landlord's consent and revenue sharing.

**7.10**   **Maintenance Services**.   Tenant shall provide, at its sole cost and expense, the following services at the Premises: trash removal services; window cleaning services; and plant maintenance and landscaping, all of which shall be paid for and arranged by Tenant pursuant to separate service agreements.  Alternatively, Landlord and Tenant may agree to have Landlord contract for any or all of such services at the Premises, and Tenant shall reimburse Landlord for the actual cost of such services, without mark-up or profit, in all cases be net of any discounts, credits, reimbursements and rebates received by Landlord.  If Landlord receives a refund of any portion of such costs that were paid by Tenant, then Landlord shall promptly reimburse Tenant the refunded Expenses, less any third party out-of-pocket expenses that Landlord reasonably incurred to obtain such refund.

**7.11**   **TruFusion**.   Landlord intends to build and operate a TruFusion (**"TruFusion"**) studio on the first floor commercial space of the Building, provided that TruFusion is unrelated to Landlord.  Landlord shall cause TruFusion to give Tenant one (1) pass per week during the Term to TruFusion for each of the Tenant's Customers. Tenant's Customers shall be able to choose from any one (1) class per week in TruFusion's schedule, subject to reasonable availability. TruFusion will also offer up to one (1) weekly class exclusively for the Tenant's Customers in the Premises (given either in the indoor/outdoor amenity area or on the roof top) as mutually agreed upon by Tenant and TruFusion.  Such passes shall not be transferrable and will not roll over or accumulate in any way. TruFusion will offer a discounted rate for full membership to Tenant's Customers, to be determined.  Notwithstanding the foregoing, in the event that TruFusion is not occupying the first floor commercial space of the Building for any reason, or fails to provide to Tenant or its Customers the services set forth under this Section 7.10, such failure shall not constitute a default under this Lease, provided that in lieu of the services to be provided to Tenant or its Customers under this Section 7.10, Landlord shall either (a) provide comparable services to Tenant or its Customers or (b) Landlord shall construct, at Landlord's sole cost and expense, in accordance with all applicable Laws, and with sufficient electric, lighting and HVAC installed, and with no increase in Base Rent or Additional Rent, a fitness center in the basement of the Building (the "Fitness Center"), in the basement of the Building and based on the plan set forth on Exhibit I attached hereto, and containing no less than 2,600 square feet, with final specifications to be reasonably acceptable to Tenant, and Landlord shall provide Tenant with a credit in the amount of $30,000.00 for the purchase of equipment for the Fitness Center.  The Fitness Center shall constitute Exclusive Common Area and Tenant and its Customers shall have the exclusive use thereof.

8.    *Common Areas.*

**8.1**    "**Common Areas**" means all areas in the Project intended for either the exclusive or non-exclusive, as set forth in this Lease, use, convenience and benefit of Tenant and the residential Customers, tenants, subtenants and their invitees, including lobbies, roofs (including the use of a portion of the roof of the Building for Tenant's satellite, internet and/or other communication equipment), garages, bike storage, trash storage and compactor rooms, storage, corridors, sidewalks, walkways, courtyards, yards, patios, landscaped or planted areas, lighting facilities, service areas and loading and unloading areas, together with (a) central and appurtenant facilities for services such as heating, cooling venting, air-conditioning, communications, security, lighting, plumbing, electrical work and fire safety, to the extent same do not constitute Tenant Systems, (b) interior walls including sheetrock, plaster and studs (other than the structural components thereof) and (c) all elevators, stairs, fire escapes and all related facilities.  "Common Areas" shall include the Exclusive Common Areas.

**8.2**    Landlord grants to Tenant, its subtenants, occupants, residents, Customers, employees and invitees the non-exclusive right to use the Common Areas during the Term, except that Tenant, its subtenants, occupants, residents, Customers, employees and invitees shall have the exclusive right to use the Exclusive Common Areas during the Term, subject to those reasonable rules and regulations regarding the use of the Common Areas that may be adopted by Landlord from time to time on reasonable notice to Tenant; provided however in no event during the Term shall such rules and regulations restrict Tenant's ability to operate the Permitted Uses.  To the extent that any such rules or regulations shall be inconsistent with the express provisions of this Lease, such provisions of this Lease shall prevail.

**8.3**    Landlord shall not be entitled to alter or change the location of any of the Common Areas, to change, add to, eliminate or reduce the extent, size, shape, number or configuration of any aspect of the Common Areas, including entrances or passageways, doors and doorways, corridors, elevators, stairs or toilets, or its operations, to temporarily close to the general public all or any portion of the Common Areas (other than in the case of an emergency), to change the arrangement, character, use or location of the Common Areas or to change Common Area to rental space and rental space to Common Area, except as required by applicable Law.

9.    *Security Deposit.*

**9.1**    Tenant shall deposit with Landlord the sum of Five Hundred Fifty Thousand ($550,000.00) Dollars, in cash or, at Tenant's option, by Letter of Credit, as a security deposit (the "**Security Deposit**") as set forth below.  The Security Deposit shall be security for the performance by Tenant of all of Tenant's obligations, covenants, conditions and agreements under this Lease. Landlord shall maintain the Security Deposit, if in the form of cash, in an interest-bearing account with all interest paid thereon forming a part of such Security Deposit. The Security Deposit may not be held in an account with other security deposits being held by Landlord. Within thirty (30) days after the expiration or earlier termination of the Term of this Lease, Landlord shall return such Security Deposit to Tenant, together with any interest accrued thereon, less such portion thereof as Landlord shall have appropriated to satisfy any of Tenant's

obligations, or any Event of Default by Tenant, under this Lease, or Landlord shall return the Letter of Credit to Tenant, as applicable, and Landlord agrees at that time to execute, at its expense, any certificates or other affidavits reasonably required by the issuing bank to cancel the Letter of Credit. If there shall be any Event of Default under this Lease by Tenant that is continuing, then Landlord shall have the right, but shall not be obligated, to use, apply or retain all or any portion of the Security Deposit for the payment of any (a) Base Rent, Additional Rent or any other sum as to which Tenant is in default, or (b) amount Landlord may spend or become obligated to spend, or for the compensation of Landlord for any losses incurred, by reason of such Event of Default (including, but not limited to, any damage or deficiency arising in connection with the reletting of the Premises). If any portion of the Security Deposit is so used or applied, then within ten (10) Business Days after Landlord gives written notice to Tenant of such use or application, Tenant shall deposit with Landlord cash in an amount sufficient to restore the Security Deposit to the original sum set forth above. No later than December 15, 2018, Tenant shall deposit with Landlord the sum of One Hundred Thirty Seven Thousand Five Hundred ($137,500.00) Dollars, representing a portion of the Security Deposit, in cash or, at Tenant's option, by Letter of Credit. Within five (5) Business Days after the Commencement Date, Tenant shall deposit with Landlord the sum of One Hundred Thirty Seven Thousand Five Hundred ($137,500.00) Dollars, and within five (5) Business Days after the final payment of the FF&E Allowance in accordance with Section 29.1, Tenant shall deposit with Landlord the sum of Two Hundred Seventy Five Thousand ($275,000.00) Dollars, in each case in cash or, at Tenant's option, by delivering to Landlord either a replacement Letter of Credit or an amendment of the existing Letter of Credit, each such deposit representing a further portion of the Security Deposit, but in no event shall the total Security Deposit exceed the sum of Five Hundred Fifty Thousand ($550,000.00) Dollars. **"Business Day"** shall mean all days, excluding Saturdays, Sundays and Federal or New York State holidays.

9.2     At Tenant's election, at any time, the Security Deposit may be in the form of, or may be substituted with, an irrevocable letter of credit (the **"Letter of Credit"**), drawn in favor of Landlord on a New York clearing house bank. Such Letter of Credit shall be: (a) in form and substance reasonably satisfactory to Landlord in its reasonable discretion (with the form of Letter of Credit attached hereto as Exhibit J being deemed satisfactory to Landlord); (b) made payable to, and expressly transferable and assignable at no charge by, the owner from time to time of the Building or, at Landlord's option, the holder of any mortgage (which transfer/assignment shall be conditioned only upon the execution of a written document in connection therewith); (c) payable at sight upon presentment to a local branch of the issuer (unless such presentation can be made by facsimile) of a simple sight draft or certificate stating that Tenant is in default under this Lease beyond the expiration of any applicable notice and cure period provided under the Lease (provided, however that in the event that a notice of default to Tenant may not be lawfully given by Landlord, then Landlord shall be entitled to draw thereunder upon presentment of a certificate stating that a notice of default cannot be lawfully given and that Tenant has failed to timely pay or perform an obligation of the Tenant under this Lease); (d) of a term not less than one year; and (e) at least ten (10) days prior to the then-current expiration date of such Letter of Credit, either (1) renewed (or automatically and unconditionally extended) from time to time through the ninetieth (90th) day after the expiration of the Term, or (2) replaced with cash in the then required amount of the Security Deposit.

**9.3**    At all times during the Term, Landlord shall be entitled to draw upon the Letter of Credit in an amount necessary to cure any outstanding Event of Default under this Lease. In the event Landlord draws upon the Letter of Credit as set forth in this Section 9, then within ten (10) Business Days after Landlord gives written notice to Tenant of such use or application, Tenant shall replace such Letter of Credit.

**9.4**    Landlord agrees to transfer the Letter of Credit to any transferee of the Building or Landlord's interest therein, whereupon such transferee shall be liable for the return of the Letter of Credit, and Landlord shall be released from all liability for the return thereof.  Subject to the terms of the Bankruptcy Code, in the event of bankruptcy or other debtor-creditor proceedings against Tenant, the Letter of Credit will be deemed to be applied first to the payment of Base Rent for all periods prior to any filings of such proceedings.

*10.    Use and Maintenance of the Premises.*

**10.1**    The Premises shall be used by Tenant (and its subtenants, occupants, residents, and Customers) for the Permitted Uses and no other uses.

**10.2**    Tenant, at its sole cost and expense, shall perform all routine maintenance and non-structural repairs to the Premises, Tenant's Systems and Tenant's Personal Property as are necessary to keep the same in good condition and repair (provided that Tenant shall be responsible for any structural repairs thereto necessitated as a result of Tenant's or its employees', agents', contractors' and representatives' gross negligence or directly related to the failure to perform routine maintenance), from and after the Delivery Date and thereafter throughout the entire Term. Tenant's repair and maintenance obligations with respect to the Premises shall not include any repairs or replacements with respect to: (a) reasonable wear and tear; (b) damage from casualty and condemnation; (c) damage and any repairs due to Landlord or its employees', agents', contractors' and representatives' negligence, willful misconduct, breach of contract or violation of Law, or of other tenants in the Building (or such tenant's invitees); (d) repairs necessitated because of defects in the construction of or the materials of the Building, including the Premises to the extent constituting Landlord's Work; and (e) damage that is Landlord's obligation under this Lease to remedy or results from Landlord's failure to fulfill such obligations.  Tenant's repair and maintenance obligations with respect to the Premises shall include any necessary repairs with respect to: (i) any carpet or other floor covering; (ii) any interior partitions; (iii) any doors; (iv) the interior side of any demising walls; (v) any telephone and computer cabling that serves Tenant's equipment exclusively (other than to the extent same is the responsibility of the applicable utility provider); (vi) appliances located within the Units; (vii) any Alterations performed by contractors retained by Tenant; and (viii) the surface of any rooftop deck, i.e., pavers, tiles or planks.  Without limiting the generality of the foregoing, Tenant agrees to:  (A) provide the Premises and the Exclusive Common Areas with janitorial and other housekeeping services, (B) keep the sidewalks immediately adjacent to the Premises (but not any sidewalks adjacent to any retail or commercial premises of the Building) free of snow, ice, debris, dust, garbage and trash, (C) provide periodic pest control services for the Premises and the Exclusive Common Areas, (D) maintain the plumbing fixtures, lighting fixtures and appliances contained within the Premises, and the HVAC air handler units contained within the Units (as part of Tenant's obligation to maintain and repair the HVAC air handler units

contained within the Units, Tenant shall enter into an annual contract with an air conditioning repair firm approved by Landlord and fully licensed to repair air conditioning units in City of Philadelphia, which firm shall regularly service the HVAC air handler units), and (E) perform Exclusive Common Area wear and tear maintenance, including, without limitation, light bulbs, filters, drywall repairs, paint and flooring maintenance and minor non-structural repairs. Landlord at all times shall cooperate with Tenant and allow Tenant, at reasonable times and upon reasonable notice (except in the event of emergency) to access the Common Areas to allow Tenant to operate, maintain and repair the Premises to the extent required under this Lease. Tenant may engage the services of a third-party property manager (a "**Property Manager**") for the Premises pursuant to a management agreement to be entered into between Tenant and such Property Manager, subject to Landlord's approval, which approval shall not be unreasonably withheld, conditioned or delayed.

  **10.3** Landlord shall, at its sole cost and expense, diligently operate, maintain and make all necessary repairs and replacements (both structural and non-structural, ordinary and extraordinary, foreseen and unforeseen, as applicable), to the Building and the Premises, including, without limitation, of the Structural Elements, the Building Systems and the Common Areas of the Building, whether or not such work is in the nature of capital improvements, consistent with the standards of Comparable Buildings, throughout the Term, and shall keep same clean and in good condition and repair, except to the extent such repairs or replacements are the specific obligation of Tenant to perform under this Lease. All repairs and replacements to be made by Landlord under this Lease shall be performed promptly (and in all events within thirty (30) days of written notice thereof from Tenant to Landlord) in a good and workmanlike manner, using materials and finishes of equal or better quality to those which existed on the Delivery Date, all consistent with the standards of Comparable Buildings. If Tenant provides notice to Landlord of an event or circumstance that requires the action of Landlord with respect to the repair or maintenance to the Premises or Building described in this Section 10.3, which if not cured or corrected shall adversely affect the ability of Tenant to conduct its business operations within the Premises, and either (a) Landlord fails to remedy the same within ten (10) days following such notice, or (b) if such event or circumstance reasonably requires more than ten (10) days to remedy, Landlord fails to commence to remedy the same within ten (10) days and thereafter diligently prosecutes the same to completion, and in the case of (a) or (b) Landlord shall not cure or remedy such default within the cure period to which Landlord is entitled under either (a) or (b) above, then and in such event Tenant may take the required action and may recover the third party reasonable costs it incurred in taking such action on behalf of Landlord. All sums so paid by Tenant and all reasonable costs and expenses of Tenant incidental thereto, shall be payable to Tenant on demand, and Landlord covenants to pay any such sum or sums with interest at a rate equal to six percent (6%) per annum (the "**Applicable Rate**"), and in the event such amounts are not paid within ten (10) days following demand therefor, Tenant shall have the right to offset the same against the Base Rent next due and owing. Tenant's exercise of its rights under this Section shall not be deemed to cure or waive any Landlord default.

  **10.4** Tenant, at its cost, will comply with all orders, requirements or conditions now or hereafter imposed upon it by all Laws, including the ADA, relating to Tenant's particular manner of use (as opposed to general residential use) of the Premises (other than the Structural Elements) for the Permitted Uses. Notwithstanding the foregoing, Landlord, at its cost, shall be responsible

for compliance with any notice of violation of the ADA to the extent same applies directly to the Building and/or the Common Areas as a whole to portions of the Building (including the Common Areas) other than the Premises, provided that Landlord shall represent and warrant that as of the Commencement Date, the Common Areas, together with the lobby, entrances, and corridors of the Building contained within the Premises, comply with ADA. "**ADA**" means the Americans with Disabilities Act of 1990 and the regulations promulgated thereunder, as the same may be amended from time to time. "**Laws**" means all present and future federal, state and local laws, statutes, ordinances, codes, and regulations applicable to the Project or the parties. Notwithstanding any provision in this Lease to the contrary, Tenant shall not be required to comply with any Laws which would require Tenant to (a) perform any structural alterations or capital alterations or replacements of any portion of the Building, unless resulting from Tenant's particular manner of use of the Premises (as opposed to general residential use), provided that in no event shall Tenant be required to perform any alterations or replacements of the Structural Elements, which shall be the responsibility of Landlord, (b) remove any Hazardous Materials installed by a party other than Tenant, its agents, employees, contractors, Customers, invitees or subtenants and their respective agents, employees, contractors or invitees, (c) correct or cure any defect or deficiency in any work performed by Landlord or with respect to the Building Systems or (d) perform any work or alteration triggered by reason of the performance by Landlord or any other tenant or occupant of the Building of any alterations or improvements at the Building. "**Hazardous Materials**" means all substances or materials declared to be hazardous, toxic or infectious under any Laws. Tenant shall not cause or knowingly permit the escape, disposal or release of any Hazardous Materials anywhere on the Project. Tenant shall not store or use at the Project Hazardous Materials in any manner not sanctioned by Law, except de minimis amounts to use in the ordinary course of Tenant's business, provided same is done in compliance with Laws. Tenant agrees to indemnify and save Landlord harmless against any losses, damages, costs, liabilities and claims (including reasonable attorneys' fees) suffered by Landlord in connection with a breach by Tenant of its obligations set forth in this <u>Section 10.4</u>, except for such losses, damages, costs, liabilities and claims caused by the acts or omissions of Landlord or its agents, contractors, invitees or employees. In the event that any Hazardous Materials in a quantity and of a nature that violates any applicable Laws are found in the Premises or in any of the Common Areas utilized by Tenant that were not introduced to the Building by or on behalf of Tenant, then Landlord shall take such action, if any, as may be required to comply with such Laws. Landlord, at its cost, will comply promptly with all violations, orders, requirements or conditions now or hereafter imposed upon it or the Building by all Laws, including the ADA, except to the extent such compliance is the express obligation of Tenant under this Lease.

**10.5**   Tenant, at its expense, after notice to Landlord, may contest by appropriate proceedings prosecuted diligently and in good faith, the validity, or applicability to the Premises or the Exclusive Common Areas (except for Structural Elements) or Tenant, of any Law, provided that: (a) Landlord shall not be subject to criminal penalty or to prosecution for a crime, or any other fine or charge (unless Tenant pays such fine or charge and any interest accrued thereon, in each case, on or prior to the due date therefor), nor shall the Premises or any part thereof or the Building or any part thereof be subject to being condemned, forfeited, defeased, encumbered or vacated by reason of non-compliance or otherwise by reason of such contest; (b) no unsafe or hazardous condition, relating to such contest, then exists in the Premises which

remains unremedied; (c) such non-compliance or contest shall not prevent Landlord from obtaining any and all permits and licenses then required under applicable Laws in connection with the operation of the Building; (d) no insurance policy carried in respect of the Building by Landlord is cancelled and no premium for any such policy is increased by reason of such non-compliance or such contest (unless Tenant pays such increase); and (e) Tenant shall keep Landlord advised as to the status of such proceedings, including any settlement thereof. Landlord agrees to execute any documents reasonably required by Tenant in order to permit Tenant effectively to carry on any such contest, provided Landlord is not thereby subjected to any cost or expense not reimbursed by Tenant or exposed to any material liability or material obligation on account thereof.

      **10.6**    Subject to the waiver of subrogation and the other waivers set forth in Sections 15.4 and 15.5, any damage to the Project caused by Tenant, or by any employee, agent, contractor, assignee, subtenant, invitee or Customer of Tenant shall be promptly reported to Landlord and repaired by Tenant, at Tenant's cost, except if Landlord fails to carry the insurance which Landlord is required to carry under this Lease and such damage would have been covered by such insurance; provided, however, that Landlord may repair any such damage after the failure of Tenant to commence such repair for a period of ten (10) days after written notice to Tenant and to thereafter diligently pursue the completion thereof (except in an emergency when Landlord may immediately perform such repairs), in which case Tenant shall reimburse Landlord for all reasonable out-of-pocket costs thereof within thirty (30) days after Tenant receives Landlord's written notice of such costs. All such reasonable out-of-pocket costs so paid by Landlord shall be payable to Landlord within thirty (30) days after written demand, after which Tenant covenants to pay any such sum or sums with interest at a rate equal to the Applicable Rate. Landlord's exercise of its rights under this Section 10.6 shall not be deemed to cure or waive any Tenant default. In addition, Tenant shall be responsible for payment of Landlord's deductible, not to exceed $10,000, in any case where Landlord's insurance is utilized for the repair of any damage under this Section 10.6.

      **10.7**    Landlord and its agents, servants and employees may enter the Premises, upon not less than forty-eight (48) hours' notice to Tenant (except in the event of an emergency in which event Landlord may enter at any reasonable time), (a) at any reasonable time to provide any services required by this Lease or to make repairs, alterations, improvements and additions either required by this Lease or applicable Laws, or (b) to exhibit the Premises to prospective purchasers, lenders and, during the final six (6) months of the Term, prospective tenants and brokers. Landlord shall use reasonable efforts (but not including the use of overtime or premium labor) to perform such work in such a manner so as to minimize interference that might be occasioned to Tenant's business operations and to minimize any damage that might result to the appearance or function of the affected areas of the Premises. Landlord shall promptly repair any damage caused by Landlord or Landlord's agents in the Premises during such entry, including any repair or replacement required to any finishes in the Premises as a result of such entry. If Tenant shall not be present when for any reason entry into the Premises shall be necessary because of an emergency, Landlord or Landlord's agents may enter the same without rendering Landlord or such agents liable therefor (if during such entry Landlord or Landlord's agents shall accord reasonable care to Tenant's Personal Property and notify Tenant immediately thereafter), and without in any manner affecting this Lease; provided that Landlord and Landlord's

contractors shall remain liable for any damage resulting from its negligence or willful misconduct. Tenant agrees to make a representative available for such entry upon at least two (2) Business Days' prior notice.

**10.8**   Any such installations made by Landlord shall be concealed behind then existing walls, floors and ceilings of the Premises if reasonably feasible and permitted under applicable Laws, provided that any pipes that are not so concealed shall be boxed in a manner reasonably consistent with the decor of the Premises and any such installations shall not cause a reduction of the usable floor space of the Premises (other than to a *de minimis* extent).

**10.9**   Unless required by any Laws outside of Landlord's reasonable control, in no event shall any windows of the Premises be temporarily or permanently closed, darkened or bricked-up for any reason whatsoever. If any windows of the Premises are temporarily or permanently closed, darkened or bricked-up due to the application of any Law, Landlord shall promptly commence, at Landlord's sole cost and expense, appropriate proceedings challenging the validity, or applicability to the Premises, of such Law, and shall (a) diligently prosecute such proceedings (to completion, if necessary), (b) keep Tenant advised of the progress of such proceedings and permit Tenant to participate in all aspects of the prosecution of such proceedings and (c) assign and, promptly after receipt, pay over to Tenant the portion of the proceeds of any damage awards or other amounts received by Landlord in connection with such proceedings equitably attributable to the number of windows in the Premises affected by such closure, darkening or bricking-up, such total damage award being net of Landlord's reasonable attorney's fees, court costs, disbursements and other expenses incurred in connection with such proceedings. In addition, in the event that any windows in the Premises are permanently affected by such closure, darkening or bricking-up, Tenant shall have the right to terminate this Lease in part as to the affected Units, or in its entirety, if Tenant is unable to effectively conduct its business in the remaining Premises. Any dispute between Landlord and Tenant pursuant to this Section 10.9 shall be submitted to arbitration pursuant to Section 31.

**10.10**   Tenant, at its own expense, shall comply with and carry out promptly, all orders, requirements or conditions imposed by all applicable Laws, which are occasioned by or required in the particular manner of use of occupancy of the Premises by Tenant or any party claiming by, through or under Tenant (as opposed to general residential use).

*11.*    *Alterations by Tenant.*

**11.1**   "**Alterations**" means all improvements, additions, fixed decorations, replacements or modifications, structural or otherwise, to the Premises or the Common Areas. "**Cosmetic Alterations**" means (a) minor Alterations (including, without limitation, the reconfiguration of the layout of apartment units on any floor, the demolition of walls between apartment units or the consolidation of apartment units) and (b) other minor changes of a decorative nature consistent with Comparable Buildings, including but not limited to painting, wall coverings and floor coverings, or window treatments, carpeting, installation or removal of furniture, fixtures and equipment and hanging pictures, in each case that are not structural and for which a building permit is not required, and not costing in excess of $50,000.00.

**11.2**    Tenant may not make any Alterations other than Cosmetic Alterations without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed so long as such Alterations do not adversely affect the Structural Elements or the Building Systems, in which case such consent may be withheld by Landlord in its sole discretion.    Notwithstanding the foregoing, Tenant shall be permitted to make Cosmetic Alterations without the consent of Landlord, but upon not less than ten (10) days prior written notice to Landlord.    Landlord agrees to respond to any request for approval of any Alterations for which Landlord's approval is herein required within ten (10) Business Days after written request.  In addition, Landlord agrees to respond to any resubmission of Tenant's Alterations within five (5) days after written resubmission of Tenant's Alterations rejected by Landlord.  If Landlord fails to notify Tenant of Landlord's approval or disapproval within such ten (10) Business Day period, or five (5) days after written resubmission of Tenant's Alterations, as applicable, then the Alterations in question shall be deemed approved by Landlord.  If Landlord consents to any Alterations (for which such consent was required), Landlord may impose any reasonable conditions it deems appropriate, including approval of plans and specifications and approval of all contractors and subcontractors (which approval shall not be unreasonably withheld, conditioned or delayed).  Notwithstanding anything herein to the contrary, Tenant shall not be required to remove any Alterations it makes to the Premises upon the expiration or termination of the Term, except for any Alterations which (a) differ materially from ordinary residential apartment installations in Philadelphia, Pennsylvania and (b) for which Landlord specifies in its consent to such Alteration that removal or restoration of such Alteration at the end of the Term is a condition of its consent to such Alteration.

**11.3**    Alterations shall be made at Tenant's expense.  Tenant shall obtain any necessary permits and furnish copies thereof to Landlord before starting any such work.  Landlord shall cooperate with Tenant, at Tenant's sole cost and expense, as is reasonably necessary in connection with Tenant obtaining all permits and approvals required to be issued by any Governmental Authority in connection with Tenant's Alterations, and upon the request of Tenant, Landlord  shall execute any applications for any permits, approvals or certificates from any Governmental Authority required to be obtained by Tenant, including any special permits or changes to the Certificate of Occupancy for the Building required in connection with any Alterations, and shall sign such applications within five (5) Business Days after request by Tenant.

**11.4**    If a mechanic's or materialman's lien is filed against the Project for any work done or materials furnished to Tenant, or claimed to have been done for or furnished to Tenant, Tenant, at its expense, shall release the lien within forty-five (45) days after notice thereof by paying off or bonding the lien or otherwise.  Tenant is not the agent of Landlord for purposes of any statute regarding the ordering of work, labor or materials for the Project or incurring any liability, obligation (contractual or otherwise) or debt in the name or on behalf of Landlord or the Building.

**11.5**    Any dispute between Landlord and Tenant pursuant to this Section 11 shall be submitted to arbitration pursuant to Section 31.

12.     *Tenant's Personal Property.*

**12.1**    "**Tenant's Personal Property**" means all equipment, appliances, machinery, fixtures, furniture, furnishings, telephone and other communications equipment, computer systems, televisions and other audio-visual equipment, and other personal property installed or placed in the Premises by and at the expense of Tenant, including operating supplies and equipment, glassware, chinaware, silverware, tablecloths, minibars, room safes, bed sheets, towels, kitchen utensils, vacuum cleaners, refuse bins, tools, fitness equipment and consumable supplies such as food, drink or paper products.

**12.2**    Tenant shall be responsible for any taxes on Tenant's Personal Property.  Tenant shall remove all of Tenant's Personal Property from the Premises at the expiration or termination of this Lease and shall repair any damage caused by this removal.

**12.3**    Landlord hereby waives any statutory or other lien rights which Landlord may otherwise be entitled insofar as Tenant's Personal Property is concerned and agrees to execute and deliver to Tenant within ten (10) days after written request therefor such evidence of Landlord's lien waiver as may reasonably be requested by Tenant's lenders.

13.     *Signage.*

**13.1**    Tenant shall be permitted to install prominent signage on the exterior of the Building and in the Building lobby and other Common Areas ("**Tenant's Signage**"), all in accordance with Tenant's corporate specifications, provided that Tenant shall not be permitted to install any signs or other identification without Landlord's prior written consent, which consent Landlord agrees shall not be unreasonably withheld, conditioned or delayed.  Notwithstanding the foregoing, Tenant may install interior and exterior signage in accordance with Tenant's signage specifications attached hereto as Exhibit D, which are hereby deemed approved by Landlord, provided that the parties acknowledge that the signage indicated on the second diagram of Exhibit D may not be currently permitted by applicable Laws and may require Tenant to obtain a variance, which variance Tenant would need to obtain at Tenant's option, and at Tenant's sole cost and expense.   To the extent any such approval is required, all signage must be approved by agencies regulating same in Philadelphia County.

**13.2**    Tenant's Signage shall include, at Tenant's request, a flagpole on the side of the Building, in a location reasonably acceptable to Landlord and Tenant, at Tenant's sole cost and expense, and subject to any applicable Law and any required approval of the applicable City of Philadelphia agencies.  Tenant, at Tenant's sole cost and expense (including any legal costs or expenses) shall apply for all permits and approvals required by Law for Tenant's Signage. Landlord shall cooperate with Tenant, at Tenant's sole cost and expense, as is reasonably necessary in connection with Tenant obtaining all permits and approvals required to be issued by any Governmental Authority in connection with Tenant's Signage, including, without limitation, upon the request of Tenant, Landlord shall execute any applications for any permits or approvals from any Governmental Authority required to be obtained by Tenant in connection with Tenant's Signage, and shall sign such applications within five (5) Business Days after request by Tenant.

Tenant shall, at its sole cost, maintain any permits or approvals required to be maintained by Tenant in connection with Tenant's Signage.  Tenant shall purchase, install and maintain Tenant's Signage, all of which shall be at Tenant's sole cost and expense.  Notwithstanding the foregoing, Landlord agrees to provide electrical hookups for Tenant's channel letter signage on the side of the Building, as set forth on Exhibit D, at Landlord's sole cost and expense.  Tenant acknowledges that Landlord currently intends to commission a public art mural from Mural Arts of Philadelphia to be placed in location "A" as set forth on Exhibit D, provided that such mural design shall remain subject to Landlord's and Tenant's agreement.

### 14.    *Assignment and Subletting*

**14.1**    Except as otherwise specifically permitted by the terms of this Lease, including Section 14.5 hereof, to (a) assign or otherwise transfer this Lease or any of its rights under this Lease, (b) sublet the Premises or any part thereof, or permit the use of the Premises by any persons other than Tenant or its Customers, employees, agents and invitees, or (c) permit the assignment or other transfer of this Lease or any of Tenant's rights under this Lease by operation of law (each, a "**Transfer**").

**14.2**    If Tenant shall desire to Transfer this Lease (except with respect to a Permitted Transfer), Tenant shall submit to Landlord a written request for Landlord's consent to such Transfer, which request shall be accompanied by the following information: (i) the name and address of the proposed assignee or subtenant ("**Transferee**"); (ii) the material terms and conditions of the proposed assignment or subletting; (iii) the nature and character of the business of the proposed Transferee and its proposed use of the leased premises; and (iv) current financial information with respect to the proposed Transferee, to the extent same has been provided to Tenant.  Landlord shall thereafter not unreasonably withhold, condition or delay its consent to the proposed Transfer, provided that:

(a)    At the time of such Transfer there is no Event of Default continuing under this Lease;

(b)    The proposed Transferee shall have reasonably sufficient financial standing and have demonstrated recognized experience in successfully operating the proposed use of the Premises (an entity that has at least five (5) years' experience operating extended stay residences in Comparable Buildings in Philadelphia, Pennsylvania or on a national basis shall be deemed to have sufficiently demonstrated recognized experience);

(c)    In case of subletting, the subtenant shall be expressly subject to all of the obligations of Tenant under this Lease and the further condition and restriction that such sublease shall not be assigned, encumbered or otherwise transferred or the Premises further sublet by the subtenant in whole or in part, or any part thereof suffered or permitted by the subtenant to be used or occupied by others, except that Units may be rented for the Permitted Use or general residential use; and

(d)    Tenant shall reimburse Landlord on demand for any reasonable out-of-pocket legal costs and disbursements incurred by Landlord in connection with said Transfer.

Landlord shall notify Tenant in writing of its consent or its objections to provide such consent, within fifteen (15) days of Tenant's request therefor.

14.3    Tenant may also, without the consent of Landlord, assign the entire interest under this Lease or sublease the entire Premises to: (a) a successor to Tenant or to Medici Living, Inc. ("**Medici**") by: (i) merger, consolidation or reorganization; or (ii) acquisition of all or substantially all of the assets, or a controlling interest in the equity interests, of Tenant and/or Medici (collectively, a "**Permitted Successor**"); or (b) any entity that is and remains a parent, subsidiary or affiliate of Tenant or Medici (each, a "**Permitted Affiliate**"); (such an assignment to a Permitted Successor or a Permitted Affiliate shall be referred to herein as a "**Permitted Transfer**"), provided in all cases that: (1) Tenant shall have given Landlord written notice at least ten (10) days prior to the effective date of the Permitted Transfer; (2) an Event of Default is not then continuing; (3) in the case of a Permitted Affiliate, Guarantor shall remain liable under the Guaranty and shall reaffirm Guarantor's obligations under the Guaranty in writing in form and substance reasonably acceptable to Landlord; and (4) in the case of a Permitted Successor, a substitute guarantor, acceptable to Landlord in its sole discretion, and affiliated with the new tenant, shall execute, as guarantor and deliver, to the Landlord a guaranty in the form of the Guaranty.

14.4    The Permitted Successor or Permitted Affiliate, as the case may be, shall sign an assumption agreement in form and substance reasonably acceptable to Landlord.  Landlord shall not be entitled to receive any part of, or otherwise share in, any of the monies or other consideration received by the assigning party in connection with a Permitted Transfer.  The assignee of a Permitted Transfer shall be subject to all of the terms and conditions of this Lease and in particular, without limiting the foregoing, no Permitted Transfer shall be deemed or construed to permit the assignee of a Permitted Transfer to use the Premises for any use other than a Permitted Use.

14.5    As used in this Lease (a) "**parent**" shall mean an entity which owns a majority of the voting equity of Medici or a Permitted Successor, (b) "**subsidiary**" shall mean an entity at least fifty-one percent (51%) of whose voting equity is owned by Medici or a Permitted Successor, (c) "**affiliate**" shall mean an entity controlled by, controlling or under common control with Medici or a Permitted Successor, and (d) "**control**" shall mean ownership of more than fifty percent (50%) of the ownership or other voting interest of the controlled entity.

14.6    Notwithstanding anything in this <u>Section 14</u> to the contrary, Landlord acknowledges and agrees that Tenant's business is that of locating and contracting with residents to occupy the leased Property, including contracting with entities for the use of their employees, students or other related individuals, as applicable (collectively, "**Customers**" and each, a "**Customer**"), for any length of stay, through residential sublease, license and/or occupancy arrangements (each, a "**Residential Agreement**" and collectively, "**Residential Agreements**") between Tenant and Customers.  Without limitation, nothing in any Residential Agreement shall purport to impose any obligations on Landlord with respect to Customers, nor shall Landlord have any rights as a third party beneficiary thereunder (except as expressly provided below or in such Residential Agreements), nor shall it create any type of direct contractual or other type of business relationship between Landlord and Customers, nor shall it alter or be at variance with

any of the rights and obligations of Landlord and Tenant under this Lease or be inconsistent with any of the provisions of this Lease.  Tenant shall have the right to enter into and negotiate Residential Agreements with Customers on any terms Tenant sees fit; provided that, all such Residential Agreements shall be consistent with and subject to the terms of this Lease (including the Permitted Uses), shall be on a form delivered to Landlord, which form may be amended or modified without Landlord's approval, provided Landlord agrees to sign a commercially reasonable form of confidentiality and non-disclosure agreement in connection with the delivery thereof from Tenant.  Notwithstanding the fact that such Residential Agreements may involve the exclusive use and/or occupancy of any or all of the Units within the Premises, the subletting, licensing and/or use of the Premises by Customers pursuant to Residential Agreements shall not be considered to be a Transfer prohibited hereunder or requiring Landlord's consent, and Tenant shall not be obligated to split, share with or pay to Landlord or any other party (including without limitation, any brokers) any compensation, rent or other consideration paid by a Customer under any Residential Agreement.

**14.7**    Except as otherwise provided below, Tenant shall pay to Landlord fifty percent (50%) of any rentals and/or other consideration paid by any Transferee pursuant to an assignment or sublease that are in excess of the Rent payable under this Lease during such period, deducting from such excess, the reasonable expenses proven to have been incurred by Tenant in effecting the assignment or sublease, such excess shall be paid by Tenant to Landlord as Additional Rent, as and when received by Tenant.  Said reasonable expenses shall include, without limitation, (i) marketing and brokerage fees, (ii) attorneys' fees and disbursements, (iii) reasonable concessions to the assignee or sublessee, including free rent or rent abatements and work contributions, and (iv) the costs incurred in connection with alterations, decorations and installations made by Tenant pursuant to its subject assignment or sublease to prepare the space for occupancy by the assignee or sublessee, and any work allowance or other monetary concession actually paid by Tenant.      Consideration paid to Tenant shall include any consideration paid for or on account of any leasehold improvements, furnishings, equipment and/or other personal property in the Premises which are in excess of the then fair market value thereof as shown on Tenant's books and records. If part of the consideration for such sublease or assignment shall be payable in other than in cash, Landlord's share of such non-cash consideration shall be in such form as is reasonably satisfactory to Landlord.  In clarification of the foregoing, in no event shall Tenant be required to pay any sums to Landlord under this Section 14.6 in connection with any Permitted Transfers to any Permitted Successor or Permitted Affiliate or with respect to any Residential Agreements.

### 15.    Insurance.

**15.1**    Tenant shall keep in full force and effect from no later than the Commencement Date and at all times thereafter during the Term broad-form commercial general liability insurance with limits in an amount of Three Million Dollars ($3,000,000) for any one occurrence, for claims arising out of Tenant's use and occupancy in or about the Premises, which may be provided in part by a policy of umbrella form or excess liability insurance.  Such insurance coverage shall extend beyond the Premises to portions of the Common Areas used by Tenant, its employees, agents, contractors, and invitees and shall include contractual liability coverage insuring Tenant's indemnities under this Lease.  In the event of any duplicate coverage

between Landlord and Tenant, Landlord's liability policy shall be primary with respect to the Structural Elements and Common Areas and Tenant's policy shall be primary with respect to the Premises. Tenant shall carry statutory worker's compensation insurance covering its employees in, on and about the Premises and Building.

15.2     Tenant shall obtain and maintain an insurance policy for Tenant's Personal Property, to the extent insurable under the available standard forms of "Special Cause of Loss Form" insurance policies, in an amount equal to one hundred percent (100%) of the replacement value thereof. All proceeds of such insurance shall be used solely to restore, repair or replace the Alterations and Tenant's Personal Property.

15.3     Landlord shall obtain and maintain, at its sole cost and expense and without reimbursement by Tenant, with solvent and responsible companies, Building and Personal Property Coverage, providing protection against any peril included within the classification "Causes of Loss - Special Form" (or the then industry equivalent) coverage for the Project (excluding Tenant's Personal Property) in an amount equal to one hundred percent (100%) of the full replacement value of the Project (exclusive of architectural and engineering fees, excavations, footings and foundations) and with co-insurance waived. Landlord shall also maintain, at its sole cost and expense and without reimbursement by Tenant, commercial general liability insurance covering injuries occurring at the Project, which shall provide for a combined coverage for bodily injury and property damage in an amount not less than Three Million Dollars ($3,000,000) per occurrence (which insurance may be provided via an umbrella and/or a blanket insurance policy).

15.4     All liability, property damage and other insurance policies carried by Tenant shall be issued by carriers that: (a) have a policyholders' rating of "A-/-VIII" or better, based on the latest rating publication of Property and Casualty Insurers by A.M. Best Company or its equivalent if that publication ceases; (b) except in the case of surplus lines, admitted to do business in the Commonwealth of Pennsylvania; (c) with respect to Tenant's liability insurance, designate, as additional insureds, Landlord, any Mortgagee (whose name shall have been furnished to Tenant) and any other parties designated in a written notice by Landlord; and (d) be written as primary policy coverage and not contributing with or in excess of any coverage which Landlord or Tenant, as applicable, may carry. In addition, all insurance policies carried by Landlord or Tenant shall contain a waiver of any right of recovery (by subrogation or otherwise) by the insurance company against the other party. Tenant shall deliver to Landlord insurance certificates evidencing the coverages required hereunder, and shall provide renewal certificates on an annual basis, and in each case providing coverage for at least twelve (12) months from date of delivery. Tenant may carry the insurance required hereunder under a blanket policy of insurance; provided that: (i) Landlord and any other parties in interest from time to time designated by Landlord to Tenant shall be named as an additional insured thereunder as its interest may appear; (ii) the coverage afforded Landlord and any such other parties in interest will not be reduced or diminished by reason of the use of such blanket policy of insurance; and (iii) the requirements set forth in this Section 15 are otherwise satisfied.

15.5     Each party hereby waives any right or cause of action for any loss of, or damage to, any of its property (whether or not such loss or damage is caused by the fault or negligence of

the other party or anyone for whom said other party may be responsible), which loss or damage is covered by valid and collectible fire, extended coverage, "Special Form" or similar policies, to the extent that such loss or damage is recovered under said insurance policies or would have been covered had the relevant party obtained the insurance required hereunder. In addition, the parties hereto shall procure an appropriate clause in, or endorsement on, any fire or extended coverage insurance policy covering the Premises, the Building and personal property, fixtures and equipment located thereon or therein, pursuant to which the insurance companies waive subrogation or consent to a waiver of right of recovery and subject to obtaining such clauses or endorsements of waiver of subrogation or consent to a waiver of right of recovery, hereby agree not to make any claim against or seek to recover from the other for any loss or damage to its property or the property of others resulting from fire or other hazards covered by such fire and extended coverage insurance; provided, however, that the release, discharge, exoneration and covenant not to sue herein contained shall be limited by and coextensive with the terms and provisions of the waiver of subrogation clause or endorsements or clauses or endorsements consenting to a waiver of right of recovery. In the event that either Landlord or Tenant shall be unable at any time to obtain one of the provisions referred to above in any of its insurance policies, Landlord or Tenant, as the case may be, shall be named as an additional insured.

16.    *Indemnity.*

16.1    Subject to the waiver in Section 15.4 above, Tenant shall, and hereby does, indemnify and hold Landlord, its parents, subsidiaries, affiliates, members, shareholders, principals, beneficiaries, partners, officers, directors, employees, agents and representatives, harmless from and against any and all liabilities, damages, causes of action, suits, claims, judgments, costs and expenses (including reasonable attorneys' fees) arising from any claimed or asserted injury, loss or damage to any persons or property (a) arising within the Premises, unless caused by the negligence or willful misconduct of Landlord or Landlord's employees or agents, (b) arising out of any negligent act or omission or willful misconduct of Tenant, its employees, contractors or agents, or (c) arising from any breach of this Lease by Tenant.

16.2    Subject to the waiver in Section 15.4 above, Landlord shall, and hereby does, indemnify and hold Tenant and all Tenant Parties harmless from and against any and all liabilities, damages, causes of action, suits, claims, judgments, costs and expenses (including reasonable attorneys' fees) arising from any claimed or asserted injury, loss or damage to any persons or property arising out of (a) Landlord's use or control of the Common Areas, the Structural Elements and the Building Systems, (b) any act or omission of Landlord, its employees, contractors or agents or (c) any breach of this Lease by Landlord except, in each case, to the extent that any such claim results from the gross negligence or willful misconduct of Tenant.

16.3    If any claim that is within the scope of any indemnity set forth in this Lease is asserted against any indemnified party, then the indemnified party shall give prompt notice (each, an **"Indemnified Party Notice"**) thereof to the indemnifying party (i.e., within a time period so as not to prejudice the indemnifying party's or its insurer's ability to defend effectively any action or proceeding brought on such claim) and the indemnifying party shall have the right to defend and control the defense of any action or proceeding brought on such claim with

counsel chosen by the indemnifying party subject to the approval of the indemnified party (such approval not to be unreasonably withheld) or by the indemnifying party's insurance company.  If the indemnifying party shall defend any such action or proceeding, then:

(a)    the indemnified party shall cooperate with the indemnifying party (or its insurer) in the defense of any such action or proceeding in such manner as the indemnifying party (or its insurer) may from time to time reasonably request and the indemnifying party shall not be liable for the costs of any separate counsel employed by the indemnified party;

(b)    the indemnifying party shall not be liable for any settlement made without the indemnifying party's consent; and

(c)    if such action or proceeding can be settled by the payment of money and without the need to admit liability on the indemnified party's part, then the indemnifying party shall have the right to settle such action or proceeding without the indemnified party's consent and the indemnifying party shall have no obligation under the applicable indemnity set forth in this Lease with respect to such action or proceeding or other actions or proceedings involving the same or related facts if the indemnified party refuses to agree to such a settlement, otherwise the indemnified party's consent shall be required (which consent shall not be unreasonably withheld, conditioned or delayed) and if the indemnified party unreasonably withholds, conditions or delays its consent to any such settlement, then the indemnifying party shall have no obligation under the applicable indemnity set forth in this Lease with respect to such action or proceeding or other actions or proceedings involving the same or related facts.

16.4    Each of the parties entitled to indemnification hereunder shall also be entitled to partial indemnification and/or contribution for such party's pro rata share of liability, and/or any sums that such party may be compelled to pay in excess of its pro rata share of liability, even where a loss arises from joint negligence.

17.    *Landlord Default.*

17.1    In the event that Landlord fails to observe any covenant or obligation of Landlord under this Lease, and such failure continues for thirty (30) days after written notice thereof from Tenant (or, if the same are not capable of being performed and completed within thirty (30) days, if Landlord fails to commence the cure within thirty (30) days or thereafter fails to diligently and continuously pursue the same to completion within such additional period of time as may be reasonably necessary to complete the same), then Tenant shall have all rights and remedies available at law or in equity.

17.2    If Landlord shall at any time fail to make any payment or perform any act which Landlord is obligated to make or perform under this Lease then Tenant, may, but shall not be obligated so to do, after thirty (30) days' notice to and demand upon Landlord, or without notice to or demand upon Landlord in the case of any emergency, and without waiving or releasing Landlord from any obligations of Landlord in this Lease contained, make such payment or perform such act which Landlord is obligated to make or perform under this Lease in such manner and to such extent as Tenant shall determine, or file for a claim for an injunction, and, in

exercising any such rights, pay any reasonably necessary and incidental costs and expenses, employ counsel and incur and pay reasonable attorneys' fees. All sums so paid by Tenant and all reasonable costs and expenses of Tenant incidental thereto, shall be payable to Tenant on demand, and Landlord covenants to pay any such sum or sums with interest at the Applicable Rate, and in the event such amounts are not paid within thirty (30) days following demand therefor, Tenant shall have the right to offset the same against the Base Rent next due and owing. Tenant's exercise of its rights under this Section shall not be deemed to cure or waive any Landlord default.

### 18.    *Damage or Destruction.*

**18.1**    If the Premises or the Project or any part thereof shall be damaged by fire or any other cause ("**Casualty**"), Tenant shall give prompt notice thereof to Landlord.

**18.2**    If, in the judgment of Landlord's architect, restoration of the Premises and the Project within a period of twelve (12) months (or six (6) months during the last twenty-four (24) months of the Term) from the date of the damage is possible, Landlord shall, subject to Landlord's receipt of sufficient insurance proceeds, restore the damaged portion of the Premises and the Project to the condition in which it existed immediately prior to such fire or casualty in a good and workmanlike manner. At such time as Landlord completes Landlord's restoration obligation, Tenant shall restore all Tenant's Alterations and Tenant's Personal Property, the same being done in a good and workmanlike manner. If the Premises (or the Exclusive Common Areas) are unusable and are not occupied, in whole or in part as a result of any Casualty (including if damage to the Project prohibits reasonable access to the Premises (or the Exclusive Common Areas)), Rent shall be abated to the extent (with respect to the Premises, Rent shall be abated on a per Unit basis, and with respect to the Exclusive Common Areas, Rent shall be abated to reflect the loss of use of the affected Exclusive Common Areas) and for the period that the Premises (or the Exclusive Common Areas) are unusable and are not occupied until the expiration of such time as is reasonably required for Tenant to restore Tenant's Alterations (but in no event more than ninety (90) days after Landlord's restoration work has been completed). If Tenant does not exercise any right to terminate this Lease under Section 18.3, and if Landlord reasonably determines that the net insurance proceeds available are not sufficient to complete the restoration obligations, then Landlord shall promptly notify Tenant of such determination and, unless Tenant in its sole discretion, within thirty (30) days of receipt of such notice, shall elect to (x) deposit with Landlord the deficiency required to complete the restoration obligations as reasonably determined by Landlord, or (y) provide to Landlord a letter of credit or other credit support in form and substance satisfactory to Landlord in its sole discretion in the amount of, and to be applied against, such deficiency, then either party shall have the right to terminate this Lease by notice to the other party given within thirty (30) days following such initial thirty (30) day period.

**18.3**    If, in the judgment of Landlord's architect, Landlord's restoration work cannot be completed within the aforesaid twelve (12) month (or six (6) month, as applicable) period, Landlord shall so notify Tenant within thirty (30) days of such Casualty, and Tenant may terminate this Lease by giving notice thereof to Landlord within ninety (90) days after the occurrence of such Casualty, in which event this Lease shall terminate as of the date of such

Casualty and Rent will be apportioned as of the date of such termination. If Tenant fails to exercise its right of termination, the Premises shall be restored as provided in Section 18.2 above. If Landlord's restoration work is not completed within the aforesaid twelve (12) month (or six (6) month, as applicable) period, Tenant may terminate this Lease at any time before such restoration work is completed by giving notice thereof to Landlord, in which event this Lease shall terminate as of the date of such notice and Rent will be apportioned as of the date of such Casualty.

### 19.    *Condemnation.*

**19.1**    If the Premises (or the Exclusive Common Areas) or any part thereof is taken by any Governmental Authority pursuant to the power of eminent domain, or by deed in lieu thereof, Tenant shall make no claim for compensation in the proceedings, and hereby assigns to Landlord any rights which Tenant may have to any portion of any condemnation award. This Lease shall terminate as to the portion of the Premises actually taken by the condemning authority as of the date title vests in such Governmental Authority, and Rent shall be ratably reduced (with respect to the Premises, Rent shall be abated on a per Unit basis, and with respect to the Exclusive Common Areas, Rent shall be abated to reflect the loss of use of the affected Exclusive Common Areas) as of such date. If any such taking shall be temporary in nature, until the expiration of such temporary taking, Rent shall be proportionately abated hereunder, and Tenant shall be entitled to that portion of the award for such taking which represents compensation for the use and occupancy of the Premises (or the Exclusive Common Areas) or any part thereof, for the taking of Tenant's Personal Property and for moving expenses.

**19.2**    The foregoing notwithstanding, Tenant shall be entitled to claim, prove and receive in the condemnation proceedings, or in any separate proceeding, any portion of the condemnation proceeding award made for the value of the estate vested by this Lease in Tenant and such awards as may be allowed for its relocation expenses, for the loss of Tenant's Signage and for Tenant's Personal Property, and the unamortized cost of Tenant's Alterations paid for by Tenant.

**19.3**    If the extent of any proposed condemnation affecting the Project is such that Landlord elects in its reasonable discretion to demolish all of the Building, then Landlord may terminate this Lease by giving at least sixty (60) days' notice of termination to Tenant at any time after such condemnation, so long as Landlord similarly terminates all other leases in the Building. This Lease shall terminate on the date specified in such notice, and Rent shall be adjusted to such date. If the extent of the proposed condemnation reduces the size of the Premises by more than twenty-five percent (25%) of the Units, or adversely affects access to the Building or the Premises, or materially restricts Tenant's ability to conduct its business in the Premises, then Tenant may terminate this Lease upon notice of termination to Landlord at any time after such condemnation.

### 20.    *Default by Tenant; Landlord's Remedies.*

**20.1**    Any of the following occurrences or acts shall constitute an event of default ("**Event of Default**") under this Lease:

(a)     Tenant fails to pay any Rent within ten (10) days after written notice from Landlord that it has not been timely paid.

(b)     Tenant fails to observe or perform any of the other covenants, conditions and agreements of this Lease (except for payment of Rent) and such failure shall continue for fifteen (15) days after notice to Tenant of such failure; provided, however, that if such failure is not reasonably capable of being cured within such fifteen (15) day period, then the period in which Tenant may cure such failure shall be extended for such additional period of time as is reasonably necessary for Tenant to cure such default, provided Tenant promptly commences and diligently pursues the cure.

(c)     Tenant (i) makes an assignment for the benefit of creditors, (ii) acquiesces in a petition against it filed in any court in any bankruptcy, reorganization, insolvency or similar proceeding, (iii) seeks, consents to or acquiesces in the appointment of any trustee, receiver or liquidator of Tenant or of all or substantially all of Tenant's assets, (iv) files a petition seeking an order for relief under the Bankruptcy Code or files a petition under any other Laws for the same or similar relief, or (v) fails to win the dismissal or other discontinuation of any involuntary bankruptcy proceeding within one hundred twenty (120) days after such proceeding is initiated.

20.2   If an Event of Default occurs with regard to the making of any payment or the doing of any act herein required, Landlord may make such payment or do such act, and the making of such payment or the doing of such act by Landlord shall not operate to cure the Event of Default or estop Landlord from the pursuing any remedy to which Landlord would otherwise be entitled.  In addition, Tenant shall pay Landlord all reasonable out-of-pocket costs (including reasonable attorneys' fees) actually incurred by Landlord in connection with any action taken by Landlord to enforce the provisions of this Lease.  All such reasonable out-of-pocket costs so paid by Landlord shall be payable to Landlord within thirty (30) days after written demand, after which Tenant covenants to pay any such sum or sums with interest at a rate equal to the Applicable Rate.  Landlord's exercise of its rights under this Section 20.2 shall not be deemed to cure or waive any Tenant default.

20.3   If an Event of Default occurs, with or without terminating this Lease, following summary dispossess proceedings or any lawful action or proceeding at law, Landlord may take possession of the Premises and remove Tenant and any other person occupying the Premises, without being liable for any claim for damages.  Landlord may thereupon make such alterations and repairs as, in Landlord's reasonable discretion, are necessary, and shall use commercially reasonable efforts to relet the Premises or any part thereof, without notice to Tenant, for such rent and subject to such arms-length terms as Landlord, in its reasonable discretion, deems advisable.  Tenant shall be liable for all reasonable out-of-pocket expenses (including reasonable attorneys' fees and brokerage fees) incurred by Landlord in repossessing the Premises, in curing any default of Tenant, in painting, altering, repairing or dividing the Premises, in protecting and preserving the Premises, and in reletting the Premises (collectively the "**Costs of Reletting**"); provided, however, that Tenant shall only be responsible for such Costs of Reletting relating to the reletting of the Premises that are allocable to the Term (i.e., based on a fraction the numerator of which is the number of months remaining in the Term and the denominator of which is the number of months in the term of any replacement lease).  In addition, in the event the Costs of

Reletting relate to portions of the Building beyond the Premises, such costs shall be prorated (based on a fraction the numerator of which is the number of rentable square feet of the Premises and the denominator of which is the number of rentable square feet in the entire relet premises). In addition, in the event of the termination of this Lease, Tenant shall pay to Landlord, as and for liquidated damages caused by such breach of the provisions of this Lease, an amount equal to any deficiency (the "**Deficiency**") between (A) Base Rent and Additional Rent for the period which otherwise would have constituted the unexpired portion of the Term (conclusively presuming the Additional Rent for each year thereof to be the same as was payable for the twelve (12) month period immediately preceding such termination or re-entry), and (B) the net amount, if any, of rents collected under any reletting effected pursuant to the provisions of Section 20.4 for any part of such period (first deducting from the rents collected under any such reletting the applicable Costs of Reletting).  Tenant shall pay the Deficiency in monthly installments on the days specified in this Lease for payment of installments of Base Rent, and Landlord shall be entitled to recover from Tenant each monthly Deficiency as the same shall arise.

      **20.4**    Notwithstanding anything to the contrary contained herein, if Landlord re-leases any portion of the Premises to a replacement tenant that is an affiliate of Landlord, and such transaction is not a bona fide arm's length transaction on market terms, the rent to be credited to Tenant's liability shall be the fair market rent at that time notwithstanding a lesser amount actually paid by such replacement tenant affiliated with Landlord.

      **20.5**    In no event shall Tenant be liable for lost profits, consequential damages, speculative damages or punitive damages under this Lease.

      **20.6**    After the occurrence of an Event of Default, Landlord may serve Tenant and the Property Manager with written notice requiring that ten (10) days following the giving of such notice, Tenant shall endeavor during the continuance of such Event of Default to cause all revenue from the Premises to be submitted directly to Landlord, bypassing Tenant.  Property Manager shall be advised of this Section 20.6 in writing in their agreement, and Property Manager shall be bound by the provisions of this Section 20.6.  In the case where a Property Manager is not engaged by Tenant, Landlord shall be provided with all information necessary to collect rent, fees or other charges directly from the Customers of the Premises, provided that Landlord shall have the right to collect rent, fees or such other charges directly from the Customers of the Premises, whether or not such information is shared by Tenant or the Tenant cooperates as required under this Section 20.6.

     *21.*    *Subordination.*

      **21.1**    "**Mortgage**" means any mortgage, deed of trust or similar instrument that is secured by the Project or any part thereof.  "**Mortgagee**" means any holder of a Mortgage. "**Ground Lease**" means any ground lease of all or any part of the Project.  "**Ground Lessor**" means the lessor under any Ground Lease.

      **21.2**    Subject to Section 21.3 below, this Lease shall be subject and subordinate to the lien of any Mortgages and to any Ground Leases, as well as any renewals, extensions, modifications, or refinancings thereof; provided, however, that if a Mortgagee or Ground Lessor

requires this Lease to be superior to such Mortgage or Ground Lease, Tenant shall execute and deliver, as directed by Landlord, any reasonable instruments required for such purpose.

21.3    Notwithstanding anything herein to the contrary, Landlord agrees to obtain from any current or future Mortgagee having any Mortgage upon the Project (or Ground Lessor under any Ground Lease), as a condition of such subordination, an executed and acknowledged agreement (a **"Non-Disturbance Agreement"**) which shall provide that this Lease and the rights of Tenant to quiet and peaceful possession under this Lease will not be terminated or disturbed during the Term as a result of any foreclosure or conveyance in lieu of foreclosure under the Mortgage held by such Mortgagee or by any termination of such Ground Lease, or the exercise of any rights or remedies under such Ground Lease or Mortgage. Any such future Non-Disturbance Agreement shall be in recordable form on such Mortgagee's or Ground Lessor's then standard form, provided the same are commercially reasonable, subject to reasonable negotiation by Tenant. Upon such attornment this Lease shall continue in full force and effect as, or as if it were, a direct lease between such successor Landlord and Tenant upon all of the terms, conditions and covenants as are set forth in this Lease and shall be applicable after such attornment.    Tenant agrees to join in execution of and to deliver such Non-Disturbance Agreement promptly after any request from Landlord. Landlord and Tenant expressly agree that Tenant shall be entitled to condition its subordination of this Lease to any future Mortgage or Ground Lease to the provision by Landlord of a Non-Disturbance Agreement in accordance with this Section 21.    Landlord represents and warrants that there is no Mortgage or Ground Lease currently affecting the Project. Tenant shall have the right to record any Non-Disturbance Agreement in the appropriate recording office of the City of Philadelphia.

21.4    If any proceedings are brought for the foreclosure of any Mortgage (or if a deed in lieu of foreclosure is delivered in connection therewith) or for the termination of any Ground Lease, Tenant, if requested by the purchaser at the foreclosure sale (or the grantee under the deed in lieu of foreclosure) or by the Ground Lessor, shall attorn to and recognize the purchaser (or grantee under the deed) or the Ground Lessor as Landlord under this Lease, subject in all events to the terms of any Non-Disturbance Agreement, and shall make all payments required hereunder to such new landlord without deduction or setoff except as expressly set forth herein. Tenant waives the provisions of any Laws that may give Tenant a right to terminate or otherwise adversely affect this Lease if any such foreclosure, termination or other proceeding is prosecuted or a deed in lieu of foreclosure is delivered, subject to the terms of any Non-Disturbance Agreement.

21.5    Tenant shall give any Mortgagee of which Tenant has received written notice, by certified mail, return receipt requested, a copy of any notice of default served upon Landlord, provided that before such notice Tenant has been notified in writing of such Mortgagee's address. Tenant shall afford such Mortgagee a period of thirty (30) days beyond any period afforded to Landlord for the curing of such default, or if such default cannot be cured within that time, then such additional time as may be necessary to cure such default (including commencement of foreclosure proceedings), before taking any action to terminate this Lease if, within such thirty (30) days, any such Mortgagee or Ground Lessor has notified Tenant of its intention to cure such act or omission and has commenced and is diligently pursuing the remedies necessary to cure such default (including, without limitation, commencement of

foreclosure proceedings or eviction proceedings, if necessary to effect such cure), provided that such period shall in no event exceed ninety (90) days in the aggregate.

21.6    Subject to the terms of any Non-Disturbance Agreement, no Mortgagee or successor to a Mortgagee (unless such Mortgagee or successor shall be an Affiliate of Landlord) shall be (i) bound by any payment of Rent for more than one (1) month in advance, (ii) bound by any material amendment or modification of this Lease made without the consent of such Mortgagee or successor, (iii) liable for damages for any breach of any prior landlord (provided that nothing herein shall affect or diminish such Mortgagee's or other successor's obligation to cure any defaults of Landlord hereunder that continue after Mortgagee or such successor's acquisition of the Building), or (iv) subject to any offsets or defenses that Tenant has against any prior landlord except as expressly set forth herein.

## 22.    *Estoppel Certificates.*

22.1    Tenant shall, at any time within ten (10) Business Days after Landlord's request, execute and deliver an estoppel certificate certifying the following:  (i) whether this Lease is unmodified and in full force and effect (or if there has been a modification, that the Lease is in full force and effect as modified and setting forth such modifications); (ii) whether the Term has commenced; (iii) the amounts of Base Rent and Additional Rent currently payable by Tenant; (iv) that no Base Rent has been paid more than thirty (30) days in advance; (v) that Tenant has no knowledge of any then uncured defaults by Landlord under this Lease (or, if Tenant has such knowledge, specifying them in detail); and (vi) the amount of the Security Deposit.  Any present or future Mortgagee and/or purchaser of the Project may rely upon any such estoppel certificate.

22.2    Landlord shall, at any time within ten (10) Business Days after Tenant's request, execute and deliver an estoppel certificate certifying the following:  (i) whether this Lease is unmodified and in full force and effect (or if there has been a modification, that the Lease is in full force and effect as modified and setting forth such modifications); (ii) whether the Term has commenced; (iii) the amounts of Base Rent and Additional Rent currently payable by Tenant; (iv) that no Base Rent has been paid more than thirty (30) days in advance; (v) the amount of the Security Deposit; and (vi) that Landlord has no knowledge of any then uncured defaults by Tenant under this Lease (or, if Landlord has such knowledge, specifying them in detail).  Any present or future lender of Tenant and/or assignee or Sublessee of the Premises or any part thereof may rely upon any such estoppel certificate, and such certificate shall be addressed to such present or future lender if requested by Tenant.

## 23.    *End of Term; Hold-Over.*

23.1    Upon the expiration or other termination of the Term, Tenant will surrender the Premises and all keys, locks and other fixtures connected therewith (except for Tenant's Personal Property), broom clean and in good order, repair and condition, except for ordinary wear and tear and damage by casualty and condemnation and damage for which Tenant is not responsible under the terms of this Lease and any repairs that are Landlord's obligation hereunder.

**23.2**   If Tenant shall not immediately surrender the entire Premises on the last day of the Term (free of all occupants, subtenants and Customers), then Tenant shall, by virtue of this Lease, become a tenant at sufferance at a monthly rental equal to (a) one hundred twenty five percent (125%) of the Monthly Base Rent payable for the month immediately preceding the holdover for the first sixty (60) days of such holdover and (b) one hundred fifty percent (150%) of the Monthly Base Rent payable for the month immediately preceding the holdover for the period of such holdover after the first sixty (60) days (the "**Holdover Amount**"), commencing said monthly tenancy with the first day after the end of the Term.   Tenant, as a tenant at sufferance, shall be subject to all of the terms of this Lease as though the tenancy had originally been a monthly tenancy.   Notwithstanding the foregoing, if Landlord desires to regain possession of the Premises promptly at the expiration of the Term, Landlord may re-enter and take possession of the Premises by any legal action or process, and Landlord may recover its reasonable out-of-pocket costs (including any reasonable legal costs or expenses) incurred as a result of Tenant's failure to vacate upon such expiration.

**23.3**   Notwithstanding anything herein to the contrary, in the event that one or more Customers shall holdover in the Premises following the expiration or earlier termination of this Lease, then, so long as such Customers shall be obligated to pay a market rent for the use and occupancy of such portion of the Premises by contract, law or otherwise, and Tenant hereby assigns such rent to Landlord, then Landlord shall be entitled to collect from such Customer any amounts payable by such Customer to Tenant, and Tenant shall not be obligated to pay Landlord the Holdover Amount.

### 24.   *Quiet Enjoyment.*

Landlord covenants that as long as this Lease is in full force and effect and no Event of Default then exists, Tenant shall at all times during the Term peaceably and quietly have, hold and enjoy the Premises, without interruption or disturbance from Landlord, or anyone claiming through or under Landlord, subject to the terms of this Lease.

### 25.   *Notices.*

All notices given by either party to the other hereunder shall be in writing and shall be hand delivered or sent by recognized overnight courier, postage prepaid or by electronic mail to the electronic mail address shown below followed by notice sent in accordance with one of the other foregoing methods on the following Business Day.   All such notices shall be addressed as follows:

| | |
|---|---|
| If to Landlord: | B.S. Ingersoll, LLC<br>1363 North 31st Street, #419<br>Philadelphia, PA 19121<br>Attention: Mr. Vaughan Buckley<br>Email: Vaughan@vaughanbuckley.com |
| If to Tenant: | Medici 1150 N. American Street LLC<br>c/o Medici Living |

046306-008/00140185-8                                  37

215 Park Avenue South, 11th Floor
New York, NY 10003
Attention: Mark Smith
Email: mark.smith@medici-living.com

With a copy to:       Medici Living Holding GmbH
Zossener Straße 55
10961 Berlin Germany
Attention: Ferdinand.von Fumetti
Email: ferdinand.vonfumetti@medici-living.de

And

Wachtel Missry LLP
885 Second Avenue
New York, NY 10017
Attention: Morris Missry, Esq.
Email: missry@wmllp.com

Upon like written notice to the other party, either party may designate a new notice address. Notice shall be deemed given upon receipt or at the time delivery is refused or in the event of failure to deliver by reason of changed address of which no notice was given, provided however that notices sent via overnight courier shall be deemed delivered on the next Business Day and in the case of electronic mail address upon the date sent as noted in the electronic mail records of the sender thereof. Any notice to be given by any party may be given by such party's attorney.

26.   *Miscellaneous.*

   **26.1   No Waiver**. All rights and remedies given herein and/or by law or in equity to Landlord or Landlord are separate, distinct and cumulative, and no one of them, whether exercised by Landlord or not, shall be exclusive of any others. No failure of Landlord or Tenant to exercise any power given hereunder, and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of Landlord's or Tenant's right to demand compliance with the terms hereof.

   **26.2   Merger and Modification**. The Exhibits attached hereto are part of this Lease. This Lease is intended as the final expression of the parties' agreement and as a complete statement of the terms thereof, all negotiations, considerations and representations between the parties having been incorporated herein. No course of prior dealings between the parties shall be relevant or admissible to determine the meaning of this Lease. No representations, understandings or agreements have been made or relied upon in the making of this Lease other than those specifically set forth herein. This Lease can only be modified in writing executed by each party.

**26.3   Waiver of Jury Trial.**   LANDLORD AND TENANT EACH HEREBY WAIVES ALL RIGHTS TO A TRIAL BY JURY IN ANY CLAIM, ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, AND/OR TENANT'S USE OR OCCUPANCY OF THE PREMISES.

**26.4**   Each party hereby represents and warrants that: (a) the Office of Foreign Assets Control of the United States Department of the Treasury ("**OFAC**") has not listed it or any of its affiliates, or any person that controls, is controlled by, or is under common control with it, on OFAC's list of Specially Designated Nations and Blocked Persons; and (b) it is not acting, directly or indirectly, for or on behalf of any person, group, entity or nation named by any Executive Order, the United States Treasury Department, or United States Office of Homeland Security as a terrorist, Specially Designated National and Blocked Person, or other banned or blocked person, group, entity, nation or pursuant to any law, order, rule or regulation that is enforced or administered by the OFAC.

**26.5   Successors Bound.**   This Lease shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, legal representatives, successors and permitted assigns.

**26.6   Joint and Several Liability.**   If this Lease is executed by more than one party as Tenant, the liability of such parties hereunder shall be joint and several.

**26.7   Severability.**   If any provision of this Lease is invalid or unenforceable to any extent, then that provision and the remainder of this Lease shall continue in effect and be enforceable to the fullest extent permitted by law.

**26.8   No Recording; Memorandum of Lease.**   This Lease shall not be recorded in any office legally established for the purpose of giving public notice of real estate records. Notwithstanding the foregoing, simultaneous with the execution hereof, Landlord and Tenant shall execute the Memorandum and Notice of Lease Agreement ("**Memorandum**") annexed hereto as Exhibit G, and the parties shall cooperate in having the Memorandum filed against the Premises in the appropriate recording office of the City of Philadelphia.

**26.9   Brokers.**   Landlord and Tenant each represents that it had no dealings with any real estate broker, finder or other agent with respect to this Lease in any manner other than the Broker. Landlord and Tenant shall each indemnify and hold the other harmless from and against from and against any and all claims for brokerage or other commissions, losses, liabilities, damages, judgments, fines, suits, demands, costs, interest and expenses of any kind or nature, including reasonable attorneys' fees and disbursements, arising from or out of any breach of the foregoing representation. Landlord shall be responsible for any commission due to Broker pursuant to a separate written agreement.

**26.10   Applicable Law; Forum.**   This Lease shall be construed under the laws of the Commonwealth of Pennsylvania. Except as expressly provided to the contrary in this Lease, any litigation in connection with, or arising out of, this Lease shall be brought in the state or federal

courts for the Commonwealth of Pennsylvania sitting in Philadelphia County. Landlord and Tenant hereby consent to such court's exercise of personal jurisdiction over them.

**26.11  Captions**.   The captions in this Lease are for convenience only and shall not affect the interpretation of the provisions hereof.

**26.12  No Construction Against Drafting Party**.  This Lease has been freely negotiated by both parties and in any dispute over the interpretation or enforceability of this Lease, it shall be irrelevant which party drafted this Lease or any portion hereof.

**26.13  Rule Against Perpetuities**.  Notwithstanding any provision in this Lease to the contrary, if the Term has not commenced within three years after the date of this Lease, this Lease shall automatically terminate on the third anniversary of the date hereof.  The sole purpose of this provision is to avoid any possible interpretation that this Lease violates the Rule Against Perpetuities or other rule of law against restraints on alienation.

**26.14  Interpretation**.  "Include," "includes," and "including" mean considered as part of a larger group, and not limited to the items recited.  "**Shall**" means is obligated to.  "**May**" means "**is permitted to.**"  The necessary grammatical changes required to make the provisions hereof apply either to corporations, partnerships, or individuals, men or women, as the case may be, shall in all cases be assumed as though in each case fully expressed.  Except as otherwise provided in this Lease, "**year**" means a calendar year.

**26.15  Consents**.  Unless otherwise provided in this Lease, whenever a party's consent is required hereunder, such consent must be written and provided in advance.  Whenever a party's consent shall not be unreasonably withheld, it also shall not be unreasonably conditioned or delayed.

**26.16  Submission of Lease.** The submission of this Lease for examination does not constitute a reservation of or an option for lease, and the same shall not be effective as a lease or otherwise until execution and delivery by both Landlord and Tenant.

**26.17  Counterparts.** This Lease may be executed in any number of counterparts, each shall be considered an original, and together they shall constitute one Lease. Facsimile signatures or electronically scanned and delivered signatures shall be considered original signatures for the purpose of execution and enforcement of the rights delineated in this Lease.

**26.18**  Other than expressly set forth herein with respect to the Guaranty, no recourse shall be had on any of Tenant's obligations under this Lease or for any claim based thereon or otherwise in respect thereof (i) against any incorporator of Tenant, subscriber to Tenant's capital stock, shareholder, employee, agent, officer or director, past, present or future, of any corporation, or any partner or joint venturer of any partnership or joint venture, or any member or manager of any limited liability company which shall be Tenant hereunder or included in the term "Tenant" or any successor of any such corporation, partnership joint venture or limited liability company, or (ii) against any principal, disclosed or undisclosed, of any such corporation, partnership, joint venture or limited liability company, or (iii) against any principal, disclosed or

undisclosed, of any affiliate of any party which shall be Tenant or included in the term "Tenant", whether directly or indirectly. Landlord shall look only and solely to the entity comprising Tenant and the Security Deposit, Tenant's assets, receipts, rents and other proceeds from the Premises for the satisfaction of any right of Landlord arising out of this Lease, or Tenant's use and occupancy of the Premises or any other liability of Tenant to Landlord.

26.19   Upon Landlord's written request, given not more than one (1) time per twelve (12) month period, Tenant shall provide a financial summary of the Guarantor, to include only a profit and loss statement and a balance sheet, with respect to the prior closed fiscal year of Guarantor, which financial summaries shall be reviewed by a certified public accountant but shall not be audited. Such financial summaries of Guarantor shall be for informational purposes only and neither Tenant nor Guarantor shall bear any liability for any of the information contained therein. Tenant also agrees to provide a quarterly report on building occupancy to Landlord until Tenant achieves a reported level of 95% occupancy.

## 27.   *Options to Extend Term.*

27.1   Tenant shall have and is hereby granted the options to extend the Term hereof for up to two (2) additional periods of five (5) years each (each an "Extension Period"), provided (i) Tenant gives written notice to Landlord of Tenant's irrevocable election to exercise an extension option (an "Extension Notice") not less than twelve (12) months prior to the expiration of the initial Term or the first such Extension Period, as applicable, time being of the essence; and (ii) no Event of Default exists at the commencement of the subject Extension Period.

27.2   All terms and conditions of this Lease, including, without limitation, all provisions governing the payment of Additional Rent, shall remain in full force and effect during each Extension Period, except that Base Rent payable for each Lease Year during each Extension Period, annually and monthly, shall equal the lesser of (i) the Base Rent set forth on Exhibit E-2 attached hereto , or (ii) the then-current Fair Market Rental Rate (hereinafter defined) at the time of the commencement of the applicable Extension Period. As used in this Lease, the term "**Fair Market Rental Rate**" shall mean the fair market rental rate that would be agreed upon between a landlord and a tenant entering into a lease renewal for comparable space as to location, configuration, size and use, in a Comparable Building for a comparable term assuming the following: (A) the landlord and tenant are informed and well-advised and each is acting in what it considers its own best interests; (B) the tenant will continue to pay Expenses as described above; and (C) all other relevant factors.

27.3   Landlord and Tenant shall negotiate in good faith to determine the Base Rent for the first Lease Year of an Extension Period, for a period of thirty (30) days after the date on which Landlord receives Tenant's written notice of Tenant's irrevocable election to exercise an extension option provided for under this Section 27. In the event Landlord and Tenant are unable to agree upon the Base Rent for the first Lease Year of an Extension Period within said thirty (30)-day period, the Fair Market Rental Rate for the Premises shall be determined by a board of three (3) licensed real estate brokers, one of whom shall be named by the Landlord, one of whom shall be named by Tenant, and the two so appointed shall select a third. Each real estate broker so selected shall be licensed in the Commonwealth of Pennsylvania as a real estate broker specializing in the field of multi-family residential leasing in the Commonwealth of

046306-008/00140185-8                          41

Pennsylvania, having no fewer than ten (10) years' experience in such field, and recognized as ethical and reputable within the field. Landlord and Tenant agree to make their appointments promptly within ten (10) days after the expiration of the thirty (30)-day period, or sooner if mutually agreed upon. The two (2) brokers selected by Landlord and Tenant shall promptly select a third broker within ten (10) days after they both have been appointed, and each broker, within fifteen (15) days after the third broker is selected, shall submit his or her determination of the Fair Market Rental Rate. The Fair Market Rental Rate shall be the mean of the two closest rental rate determinations. Landlord and Tenant shall each pay the fee of the broker selected by it, and they shall equally share the payment of the fee of the third broker.

27.4    Should the Term of the Lease be extended hereunder, Landlord and Tenant shall execute an amendment modifying this Lease as set forth above with respect to the applicable Extension Period and applicable Base Rent within ten (10) Business Days after Landlord presents same to Tenant, which amendment Landlord shall present to Tenant within thirty (30) days following the determination of the Base Rent as set forth above, which agreement shall set forth the Base Rent for the first Lease Year of the applicable Extension Period and the other economic terms and provisions in effect during the applicable Extension Period as set forth above. Should Landlord or Tenant fail to execute the amendment (which amendment accurately sets forth the information set forth above) within ten (10) Business Days after presentation of same by Landlord, or if Landlord shall fail to timely so present such amendment, time being of the essence, such failure shall not affect the validity of Tenant's exercise of its option to lease the Premises during the applicable Extension Period or the determination of Base Rent during the applicable Extension Period.

27.5    If the final determination of Base Rent for the applicable Extension Period shall not be made on or before the commencement of the first Extension Period or the second Extension Period, as applicable, in accordance with the provisions of this Section 27, then pending such final determination, Tenant shall pay as Base Rent for the applicable Extension Period the Base Rent in effect for the last Lease Year of the initial Term or the first such Extension Period, as applicable. If, based upon the final determination of such Base Rent as provided herein, the payments made by Tenant on account of Base Rent for the applicable Extension Period were (i) less than the Base Rent as finally determined in accordance with the provisions hereof, Tenant shall pay to Landlord the amount of such deficiency, within thirty (30) days after demand therefor, or (ii) greater than the Base Rent as finally determined in accordance with the provisions hereof, Landlord shall credit the amount of such excess against the next installments of Rent due under this Lease.

28.    *Marketing; Confidentiality.*

28.1    Neither Party has the right to use, and neither Party will use without the other Party's prior written consent, the names, characters, artwork, designs, trade names, copyrighted materials, trademarks or service marks of the other Party, its Customers, its affiliates or parent or subsidiary companies, employees, directors, shareholders, assigns, successors or licensees: (i) in any advertising, publicity or promotion; (ii) to express or to imply any endorsement by the other Party or its Customers; or (iii) in any manner other than as expressly authorized in accordance with this Lease or any other written agreement between the Parties. Any public announcement

or disclosure related to this Lease naming Tenant must be approved by Tenant prior to any such announcement or disclosure.

28.2     The terms of this Lease shall be maintained by Landlord in strict confidence and shall not be revealed to any other person.  Notwithstanding the foregoing, Landlord may disclose any such information: (i) to its managers, members, shareholders, partners, directors, officers, lenders, purchasers, investors, employees, attorneys, accountants, appraisers, insurance advisors, consultants and similar third party professionals; provided, however, that in all such cases such parties shall maintain the confidential nature of such information; (ii) to the extent such information is otherwise available from public sources; (iii) if such disclosure is required by Law; (iv) in connection with any suit, action, arbitration or other proceedings between the parties hereto; or (v) if such disclosure is required in connection with the preparation or filing of any tax returns, securities filings or other filings required by any applicable Law.

29.     *FF&E Allowance.*

29.1     **FF&E Allowance.**  Landlord agrees to provide to Tenant an allowance (the "**FF&E Allowance**") in an amount equal to Four Hundred and Fifty Thousand ($450,000.00) Dollars to be applied solely to the FF&E Costs within the Premises and the Exclusive Common Areas.  FF&E Costs shall be disbursed by Landlord from the FF&E Allowance at any time following the Effective Date, as and when such costs are actually incurred by Tenant.  Tenant shall submit to Landlord, from time to time, requests for direct payments to third parties, of or for reimbursement to Tenant for FF&E Costs incurred by Tenant out of the FF&E Allowance, which requests shall be accompanied by: (i) paid receipts or invoices substantiating the costs for which payment is requested; and (ii) lien waivers from the party supplying the services or materials for which payment is sought. Provided Tenant delivers to Landlord an approved draw request, prepared as set forth above, Landlord shall pay the costs covered by such payment request within thirty (30) days following receipt thereof.  As used herein, the term "**FF&E Costs**" shall mean all costs associated with the purchase and installation of the following items to be used within the Premises and all exclusive Common Areas: furniture (including, without limitation, all moveable furniture such as beds, couches, movable armoires, kitchen furniture, table, chairs, stools, movable armoire and hangars, bed frame and mattress, desk and chair, moveable and built-in shelving, indoor and outdoor patio furniture), fixtures, equipment, linens, rugs and carpets, lighting (including, without limitation, decorative lighting and decorative lighting elements, floor or desk lamps), electronic equipment, cabling, small and countertop kitchen equipment (i.e., coffee makers, toasters, small equipment), flatware, dishes and other kitchenware, washers and dryers, artwork (not including fine art) and décor, movable grills and fire pits and deposits with respect to the foregoing.  In the event that Landlord fails to pay to Tenant any amount of the FF&E Allowance pursuant to this <u>Section 29</u> when the same becomes due and payable, and if any such failure described above continues uncured for a period of ten (10) days after written notice thereof by Tenant to Landlord, then and in such event, in addition to any other rights or remedies to which Tenant may be entitled, Tenant may offset such due and payable but unpaid amount or obligation against the next installment or installments of Rent becoming due under this Lease, together with interest thereon, commencing on the date that such amount was due and payable to Tenant under this Lease, at the Applicable Rate until fully recovered.

*30.     Tenant's Financing.*

**30.1     Leasehold Lender.**   Notwithstanding anything in this Lease to the contrary, Tenant shall have the right from time to time to encumber, pledge, mortgage and collaterally assign its rights under this Lease to any third party lender (a **"Leasehold Lender"**), not affiliated with Tenant.

**30.2     Cooperation.**   Landlord shall cooperate with Tenant in working with the Leasehold Lender to effectuate the mortgage of Tenant's leasehold interest and agrees to the following:

(a)     Landlord shall enter into and shall use good faith efforts to cause any mortgagee of Landlord's fee simple interest in the Premises to enter into a non-disturbance and attornment agreement or any other agreement reasonably required by a Leasehold Lender to effectuate the mortgage of Tenant's leasehold interest, provided same does not give the Leasehold Lender a prior position over the Landlord's Lender or impair its title;

(b)     Without Leasehold Lender's written consent:

(i)     No agreement between Landlord and Tenant modifying, canceling or surrendering this Lease shall be effective;

(ii)     No merger of the Lease with the fee simple interest or any other estate in the Premises shall result from the union of the interests of Landlord and Tenant or otherwise: and

(iii)     No agreement or acquiescence by Tenant shall be effective with respect to any rejection or termination of the Lease by Landlord or its trustee in bankruptcy, whether made with respect to any election under Section 365(h) of the Federal Bankruptcy Code of 1978 (or any successor provision) or under any similar law or right of any nature, or otherwise.

(c)     Landlord shall deliver to the Leasehold Lender a duplicate of any notice given to Tenant under this Lease, and no such notice shall be effective unless given to the Leasehold Lender;

(d)     Leasehold Lender shall have the right (but not the obligation) to cure or cause to be cured any default by Tenant under this Lease and shall have thirty (30) days after notice to cure any monetary default by Tenant under this Lease and sixty (60) days after notice in which to cure any non-monetary default by Tenant under this Lease unless an additional period of time is necessary and Leasehold Lender has commenced to cure and is diligently pursuing to cure such default;

(e)     With respect to any non-monetary default by Tenant under this Lease that is not reasonably susceptible of being cured by the Leasehold Lender without taking possession of the Premises, Landlord shall take no action to terminate this Lease on account of such default if, within sixty (60) days after notice of the default from Landlord, the Leasehold Lender shall have commenced appropriate proceedings to obtain possession of the Premises (including possession by a receiver) or to foreclose the Leasehold Lender's mortgage or security deed or

otherwise to acquire Tenant's interest under this Lease, and shall thereafter be prosecuting the same to completion with diligence and continuity, provided that all rents and any other monies due from Tenant hereunder, are paid in a timely manner;

(f) In the event of any termination of this Lease prior to the expiration of the Term, Landlord shall give the Leasehold Lender notice of the termination together with a statement of all sums that would then be due from Tenant under this Lease but for such termination, and a statement of all other defaults (if any) under this Lease then known to Landlord, and, for fifteen (15) Business Days after receipt of the termination notice and statements, the Leasehold Lender shall have the option, exercisable by written notice to Landlord, to either assume this Lease or to obtain a new lease of the Premises from Landlord on the following terms and conditions:

(i) The new lease shall be effective as of the date of termination of this Lease, shall be for the remainder of the Term and shall be at the Rent and upon all the agreements, terms, covenants and conditions of this Lease;

(ii) The new lease shall require the tenant thereunder to perform any unfulfilled obligation of Tenant under this Lease which is reasonably susceptible of being performed by the Tenant under such new lease;

(iii) Upon the execution of the new lease, the Tenant under this Lease shall pay any and all sums that would at the time of the execution thereof be due under this Lease but for such termination, and shall pay all expenses, including reasonable attorneys' fees, courts costs and disbursements incurred by Landlord in connection with such defaults and termination, the recovery and possession of the Premises and the preparation, execution and delivery of the new lease; and

(iv) Effective upon the commencement of the term of any new lease executed pursuant to the foregoing, all subleases (if any) shall be assigned and transferred without recourse by Landlord to the Leasehold Lender under the new lease.

**30.3  Liability of Leasehold Lender.** Notwithstanding anything in this Lease to the contrary, the Leasehold Lender shall not be liable or responsible in any respect for any of Tenant's obligations under this Lease unless and until the Leasehold Lender becomes the owner and holder of this Lease through foreclosure proceedings, exercise of the power of sale, or deed or assignment in lieu thereof. If the Leasehold Lender or any affiliate of the Leasehold Lender shall acquire Tenant's interest in the Lease or shall become the tenant under any new lease made pursuant to this Section, then the Leasehold Lender or its affiliate may assign this Lease or such new lease and thereupon shall be released from all liability for the performance or observance of the covenants and conditions to be performed or observed on the part of Tenant under this Lease or such new lease from and after the date of such assignment.

**30.4  Additional Provisions.** Landlord agrees and acknowledges that it will enter into any amendments to this Lease in order to reflect any other commercially reasonable terms that the Leasehold Lender may from time to time reasonably request to confirm and protect the

046306-008/00140185-8                    45

Leasehold Lender's rights and interests as a leasehold mortgagee. The provisions of this Section in favor of the Leasehold Lender shall inure to the benefit of the Leasehold Lender and its successors and assigns, and also any other tenant under or transferee of this Lease pursuant to any foreclosure proceedings, exercise of the power of sale or deed or assignment in lieu thereof. Anything herein to the contrary notwithstanding, such amendment shall in no event increase any of Landlord's obligations, or materially diminish any of Landlord's rights, or diminish any of Tenant's monetary obligations to Landlord, under this Lease.

*31.    Arbitration.*

In any instance where (a) Landlord has specifically agreed in this Lease that it will not unreasonably withhold its consent or approval under this Lease and Tenant disputes the reasonableness of the withholding by Landlord of such consent or approval, except that Tenant may not dispute the reasonableness of Landlord's withholding its consent when such consent is withheld solely by reason of Landlord's failure to have obtained the consent of a Mortgagee or Superior Lessor (provided that Landlord requested such consent), or (b) this Lease provides, or the parties otherwise agree, that a dispute with respect to a specific matter may be submitted to arbitration, then either party may submit such dispute for resolution by arbitration in the City of Philadelphia, Commonwealth of Pennsylvania, in accordance with the Commercial Arbitration Rules (Expedited Procedures) of the American Arbitration Association or its successor ("AAA"), except that the terms of this Section 31 shall supersede any conflicting or otherwise inconsistent rules. Any dispute as to the reasonableness of Landlord's withholding of consent shall be submitted to arbitration by Tenant within sixty (60) days after notice of the withholding of consent has been given by Landlord to Tenant. Provided the rules and regulations of the AAA so permit, (i) the AAA shall, within two (2) Business Days after such submission or application, select a single arbitrator having at least ten (10) years' experience in leasing and management of Comparable Buildings, (ii) the arbitration shall commence two (2) Business Days thereafter and shall be limited to a total of seven hours on the date of commencement until completion, with each party having no more than a total of two hours to present its case and to cross-examine or interrogate persons supplying information or documentation on behalf of the other party, and (iii) the arbitrator shall make a determination within three (3) Business Days after the conclusion of the presentation of Landlord's and Tenant's cases, which determination shall be limited to a decision upon (A) whether Landlord acted reasonably in withholding its consent or approval, or (B) the specific dispute presented to the arbitrator, as applicable. The arbitrator's determination shall be final and binding upon the parties, whether or not a judgment shall be entered in any court. All actions necessary to implement such decision shall be undertaken as soon as possible, but in no event later than ten (10) Business Days after the rendering of such decision. The arbitrator's determination may be entered in any court having jurisdiction thereof. All fees payable to the AAA for services rendered in connection with the resolution of the dispute shall be paid by the unsuccessful party.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the date and year first above written.

LANDLORD:

**B.S. INGERSOLL, LLC,**
a Pennsylvania limited liability company

By: _~~Dana Spain~~_
Name: ~~DANA SPAIN~~
Title: ~~Managing Member~~

TENANT:

**MEDICI 1150 N. AMERICAN STREET LLC,**
a Delaware limited liability company

By: _____
Name: ~~Mark S. Sudis~~
Title: _____

046306-008/00140185-8